SAMUEL S. LINTHICUM and MARY A. LINTHICUM, his
Wife vs. JOHN R. D. THOMAS.

*Construction of Agreement for exchange of property—Meaning
of the phrase "Passing of papers"—Specific performance—
Deed declared void which was delivered as an Escrow and
fraudulently placed on record—Jurisdiction in Equity in such
cases—By whom claim for Betterments or improvements on
property may be successfully asserted.*

An agreement in writing was entered into between L. and T. for the
conveyance by each to the other of real estate and other property.
It was provided in the agreement that T. was to pay the taxes on
his farm, and interest on a mortgage thereon to date, and also that
"the property of L. must have taxes, and ground rent, and interest
on mortgage paid up to *passing of papers.*" HELD :

1st. That by the terms of the contract, as well as by legal implica-
tion, each party was entitled to have the property agreed to be
given him, free from all incumbrances, save those specified in the
contract itself.

2nd. That the phrase "passing of papers," evidently meant the exe-
cution and delivery of formal conveyances, securing to each the
title contracted for; that is to say, a title such as the records would
disclose, showing the property free from all other liens except
those mentioned and agreed upon.

3rd. That when the title was thus made clear, and not before, each
would be entitled to demand from the other the execution and
delivery of the deed; and apart from contract, the law would
require this delivery to be made by each simultaneously.

So far as the title of T. was concerned no difficulty ever existed, but
most of the property of L. was deeply incumbered. Deeds were
made by L. for the property to be conveyed by him and were
placed in the hands of B. A deed was also executed by T. for the
farm to be conveyed by him; the wife of L. being named therein
as grantee, at the request of L. This deed was placed in the
hands of L., for examination merely, as claimed by T., and was by
L. placed upon record. On a bill filed by T. against L. and wife,
it was HELD :

Linthicum and Wife *vs.* Thomas.

1st. That the weight of evidence showed that all the deeds were to be placed in the hands of B., to be kept by him until the assent of all parties was given for their delivery, when L. had cleared the title to his property.

2nd. That honesty and fair dealing required such an arrangement, and it was only equivalent to what the law itself, applied to the contract, would have exacted.

3rd. That the placing the deed from T. upon record by L. without the assent of T., and his entering upon the farm, was such a violation of the contract and the subsequent agreement as to the custody and delivery of the deeds, as to entitle T. to immediate relief in equity.

4th. That as the incumbered condition of L's property at the time when the bill was filed was such that it could not *then* be immediately transferred to T. in accordance with the contract, he could not, as against the relief prayed, take the ground that he could have his title ready at the time of decree, as was allowed to a complainant in a bill for specific performance.

5th. That the complainant was entitled to a decree annulling both the deed from T. to L's wife, and the agreement between T. and L. for the sale or exchange of property.

This case distinguished from that of *McShane vs. Hazlehurst*, 50 *Md.*, 107.

A claim for permanent improvements, or betterments, can be successfully asserted only by one who is a *bona fide* occupant or possessor. It can never be maintained by a mere *tort feasor*, or *mala fide* intruder who holds with full knowledge of his own position, and of the adverse claim.

APPEAL from the Circuit Court for Baltimore County, in Equity.

The appeal in this case is taken from a decree of the Court below, setting aside and annulling a deed from John R. D. Thomas, the appellee, to Mary A. Linthicum, one of the appellants, the wife of Samuel S. Linthicum, the other appellant, and also declaring void an agreement between said John R. D. Thomas and Samuel S. Linthicum for an exchange or sale of certain property. The appellee was the complainant below, and the appellants

were the defendants.　The case is stated in the opinion of the Court.

The cause was argued before MILLER, STONE, ALVEY, IRVING, and RITCHIE, J.

*Julian I. Alexander,* and *M. Bannon,* for the appellants.

*John Carson, Jr.,* and *John Carson,* for the appellee.

MILLER, J., delivered the opinion of the Court.

The testimony in this record is voluminous.　On some points it is obscure and confused, and on others conflicting. The controversy appears to have been a very bitter one, involving even personal conflicts between the parties, resistance to the orders of the Court, the intervention of the sheriff, and arrests for contempt..　We have examined the testimony very carefully, but in deciding the case it will not be necessary to go much into details, and where questions of fact are to be disposed of we shall simply state the conclusions which, in our opinion, are sustained by the weight of evidence.　The litigation had its origin in a written agreement for an exchange of property entered into by Thomas and Linthicum on the 7th of May, 1878. This instrument, though not drawn with much skill, is, nevertheless, sufficiently plain to enable the Court to gather from it the terms and subject-matter of the contract, which, in substance, are as follows:

Linthicum agreed to give Thomas: 1st. A house on Gilmor street, subject to a ground-rent of $100; Linthicum to have finished the cellar, and shed in the rear, and Thomas to pay for tin-roof; this house to be clear of incumbrance *or* Thomas to take three houses intended to be deeded to one Willis when he pays up the liens and ground-rents on the same, supposed to be $500.　2nd. A house and lot at Waverly, subject to a ground-rent of $50;

for this house Linthicum is to furnish and deliver on the premises all the material for a kitchen of certain prescribed dimensions, and Thomas is to pay the carpenter and for the work to be done. 3d. Two houses on Howard street, Nos. 321 and 319, subject to a mortgage of $250 on each; and on these houses the carpenter and brick work is to be repaired by Linthicum when required. 4th. An assignment of a mortgage on a farm of sixty acres in Anne Arundel County, near Jessup's Cut, for $900, due October 22nd, 1878, with interest. And for the above Thomas agreed to give Linthicum his Glencoe farm in Baltimore County of 250 acres, subject to a mortgage of $2500, his implements on the premises, three mules, sheep and lambs, two cows, and his half interest in the crops on the place; Linthicum to take the agreement Thomas had made with Amos, the tenant, whose time will be up on the 21st of June, and Thomas to pay taxes on the farm and interest on the mortgage to date. The agreement then concludes thus: "The property of Linthicum must have taxes, and ground-rent, and interest on mortgage paid up to '*passing of papers.*'"

By the terms of this contract as well as by legal implication, each party was entitled to have the property agreed to be given him, free from all incumbrances, save those specified in the contract itself. The phrase "passing of papers" evidently means the execution and delivery of formal conveyances, securing to each the title contracted for, that is to say, a title such as the records would disclose, showing the property free from all other liens, except those mentioned and agreed upon. When the title was thus made clear, and not before, each would be entitled to demand from the other the execution and delivery of his deed, and, apart from contract, the law would require this delivery to be made by each simultaneously. So far as the title of Thomas to his farm was concerned no difficulty ever existed, but most of the

37        v. 59.

property of Linthicum was deeply incumbered. There were arrears of taxes and water rents, as well as unsatisfied mechanics' liens, resting upon it. He had no legal title to the Howard street houses, and, in reference to the Anne Arundel County farm, the records showed unsatisfied mortgages by, and judgments against, the former owners of the same, which would override and make valueless the mortgage which he had contracted to assign to Thomas. No time was specified in the contract within which these incumbrances were to be removed, and the law allowed a reasonable time therefor. If, then, the parties saw fit to have their conveyances executed before the title had been thus cleared, common prudence, especially on the part of Thomas, would have dictated the withholding of delivery until he had been made secure. The most feasible as well as fair mode of proceeding in such a state of case, would have been to have the deeds placed in the hands of some third party, not to be delivered until both parties agreed and assented thereto. Now Thomas insists that this was in fact what was agreed should be done. He avers, it was agreed that the deeds should be placed in the hands of Mr. Benzinger, to be kept by him, until the assent of both parties was given for their delivery, and, in our opinion, the weight of evidence sustains him in this position.

Benzinger testifies that Linthicum left with him a deed to Thomas of the Waverly property, dated the 29th of May, 1878, on which at the time of its receipt he endorsed "to be kept as an escrow until both parties agree to its delivery," and that both parties expressly directed him to keep it upon the condition thus stated on its back; that on the 12th of June, Linthicum executed in his office, two other deeds to Thomas, one for the Gilmor street and the other for the Howard street property, and left them with him; that he understood that all these deeds were thus left with him until the titles of both parties were put in

the condition agreed upon, which, as he understood, were to be free of incumbrances, except such as were provided for by the contract of the 7th of May; that the mortgage of the Anne Arundel farm, which was to be assigned to Thomas, was also left with him by Linthicum's counsel, but he never prepared any assignment of it. Again, he says the instructions were, and, as he understood, assented to by both parties, that the deeds should remain in his custody until the entire transaction could be consummated, the occasion of the delay being the incumbered condition of some of Linthicum's property; that he had frequent interviews with the parties, both singly and together, and from all that transpired between them and himself, they seemed to understand it to be their duty to each other, to have the titles, which were to pass from them respectively, freed from all incumbrances, save those particularly mentioned in the contract; and that Linthicum on several occasions warned him not to deliver his deeds until authorized by them, or until the whole matter went through.

In reference to the deed of his farm from Thomas to Linthicum, the facts appear to be these: It was prepared by a conveyancer employed by Linthicum, and was executed by Thomas and wife on the 11th of June, the day preceding that on which Linthicum executed two of his deeds. When thus executed, a blank was left for the name of the grantee, as Linthicum desired the deed to be taken in the name of his wife. The next day the name of the wife was inserted, and some other blanks filled up, and on the same day Thomas called for the deed in order to give it to Benzinger, but the conveyancer told him he was instructed to give it to Linthicum, and he would deliver it to no one else. Thomas thereupon suggested that he would accompany his son with it to Linthicum's place of business, and the conveyancer then gave it to his son, with instructions to deliver it to Linthicum, and Thomas and

the son then left the office with the deed. Now this son of the conveyancer, a youth of about eighteen years of age, testifies that he rode up to Linthicum's office on Greene street with Thomas, and there gave the deed to Linthicum, who said he would look it over and return it to Mr. Benzinger. As to these facts, this witness is clear and positive. The circumstances attending the transaction were such as would be likely to impress themselves upon the mind and memory of a young man in his position, and we find nothing in the attempts made to contradict him, to shake our confidence in his testimony. Thomas himself, who was present at the time, swears to the same thing.

This proof, corroborated, as it is, by the clear statements of Benzinger, outweighs, in our judgment, the denial of Linthicum and the testimony of Isaacs, his clerk, who says the deed was delivered to him. We think it establishes the fact that there was an agreement between these parties, that the deeds on both sides should be placed in the hands of Benzinger to be delivered only upon the assent of both, when Linthicum had cleared the title to his property, if, indeed, he could clear it in time to save the contract. Honesty and fair dealing required such an arrangement, and it was only equivalent to what the law itself, applied to the contract, would have exacted. It is, moreover, what the whole conduct of both parties up to this time indicated to be their understanding. We can hardly suppose that Thomas could have been so incautious and imprudent as to make an absolute delivery of his deed, and thus part with his farm, before he had ascertained whether the property he was to receive in exchange, was not so incumbered as to put him to the hazard of getting little or nothing in return. Besides this, the express direction of Linthicum to have his deeds thus kept can be explained only upon the assumption that such an arrangement was, in fact, made. He well knew that his property was not

then in such a condition, as to its record title at least, as to authorize him, under the contract, to demand a conveyance from Thomas, and good faith on his part required him to place the deed from Thomas in the same position as his own.

Such, then, being the agreement of the parties, what followed? We find that Linthicum instead of giving the deed to Benzinger as he had promised, kept it for some time, and then sent it to the county for record, and it was recorded on the 16th of July. We find also that he did this without the assent of Thomas, and then entered upon the farm. This we are constrained to pronounce such an act of bad faith on his part, such a violation of the contract and the subsequent agreement as to the custody and delivery of the deeds, as to entitle Thomas to immediate relief in equity. This, however, he did not immediately seek. He first applied to Linthicum and requested him to reconvey the property so that he could execute another deed therefor, which he agreed to do, and have it placed in Benzinger's hands, to be delivered when the titles were put in condition as the contract required. This was certainly a fair and reasonable proposal, and if it had been met in the spirit in which it was made, this litigation might have been avoided. But it was rejected by Linthicum, and he insisted upon holding on to the farm under the deed. Thomas then, on the 12th of August, filed his bill praying that the deed be annulled, the contract rescinded, and for an injunction restraining Linthicum and wife from selling, mortgaging, or otherwise incumbering the property. This was followed by an amended and supplemental bill, filed on the 28th of August, praying for an injunction prohibiting Linthicum and wife and certain named parties, their servants and agents, from removing or interfering with the crops on the farm, or the personal property mentioned in the contract, from remaining upon or occupying the farm, or interfering with

the occupation of the same by the complainant or his tenant, and from making any futher alterations or pretended improvements on the dwelling house, or doing any further work thereon.

The testimony very clearly shows that when these bills were filed, Linthicum had not cleared up the title to his property. Mechanics' liens remained unsatisfied on the Gilmor street house. Taxes and water-rents were still in arrear and unpaid. There was an outstanding unreleased mortgage on the Waverly property. He had not acquired the legal title to the Howard street houses. It was uncertain whether the mortgage on the Anne Arundel land amounted to $900, and some of the prior incumbrances on that property had not been released on the record. In short, his title, as it then stood, was so manifestly, defective, that a Court of equity would not for a moment have considered it such as a purchaser would be bound to accept, in a case of specific performance. We have thus noticed the state of his title at this time, because, in our opinion, the only defence he could justly make to the relief prayed by these bills, (even if that would suffice) was to show that his property was *then* in a condition to be immediately transferred to Thomas in accordance with the contract. As against these bills he could not take the ground that he could have his title ready at the time of decree, as is allowed to a complainant in a bill for specific performance. What Thomas chiefly demanded by these bills was that the deed which had been wrongfully placed upon record should be annulled, and that he should be restored to the possession of his farm. He had the right to ask this relief at this time, and a subsequent clearing of his title (if it ever was so cleared) by Linthicum was no defence to this suit.

In our opinion, then, the filing of these bills was made necessary by Linthicum's own bad faith and wrongful acts, and he must abide the consequences. Before the suit

terminated in a decree annulling the deed and rescinding the contract he became insolvent, and all the property he had contracted to convey to Thomas has passed out of his control and possession, so that it is impossible for him now to perform his part of the contract even if the decree should be reversed. So far as Thomas is concerned, the effect of a reversal and holding the deed to be valid, would be to compel him to make a gift of his farm to Linthicum's wife. The injustice of that is manifest, and nothing but the clearest evidence that he voluntarily delivered the deed, and the most stringent rules of law, would justify a Court of equity in allowing such a result to follow from these proceedings. But it is not necessary to look to the consequences of a reversal, for we are all satisfied the decree was rightfully passed under the bills, answers, and evidence in the cause. The case differs widely from that of *McShane vs. Hazlehurst,* 50 *Md.,* 107. In that case the contract was executed and the deeds on both sides had been delivered and recorded. The Court held there was not sufficient evidence of fraud in the case to authorize the cancelling of a contract thus executed. Here the contract was not only never executed, but was broken up by the bad faith and misconduct of one of the parties to it before the time for its complete execution had arrived.

It is insisted, however, that in any event the appellants are entitled to a lien for the value of the improvements they have put upon it, and to have the property sold for the payment thereof. But a claim for permanent improvements or betterments can be successfully asserted only by one who is a *bona fide* occupant or possessor. It can never be maintained by a mere *tort feasor* or *mala fide* intruder, who holds with full knowledge of his own position and of the adverse claim, and in that light we must regard these appellants. They entered wrongfully under a deed which they had improperly placed upon record, and were not ignorant that their title was contested. In fact the

greater part of the work on the house was done after the first bill had been filed, praying that the deed which was their sole title to the property, might be annulled.

In reference to any sums which Thomas may have collected from the rent of the houses referred to in the contract, it is sufficient to say, there is ample remedy at law for their recovery. Under the circumstances we see no occasion for any accounting in equity, and shall not, therefore, remand the case for that purpose.

*Decree affirmed.*