OSCAR F. GAVER *v.* ALFRED W. GAVER.
[No. 9, January Term, 1939.]

*Decided February 2nd, 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*H. K. De Lauter,* for the appellant.

*David C. Winebrenner, 3rd,* for the appellees.

OFFUTT, J., delivered the opinion of the Court.

George W. Gaver died at his home at Airview, near Middletown, in Frederick County, on May 16, 1919, leaving to survive him his widow, Susan R. Gaver, two sons, Alfred W. Gaver and Oscar F. Gaver, and a daughter, Annie V. Gaver, who later married Louis J. Moore, Sr. At the time of his death he owned a lot containing one and one-fourth acres of ground on the National Turnpike at Airview, improved by an eight-room brick dwelling in which he resided, but he appears to have owned at that

time no other property of any kind. He left a will duly executed to pass real and personal property, dated July 30th, 1898, in which he named as executors his wife and Alfred W. Gaver, his son, and on December 24th, 1908, he executed a codicil to that will in which he added his son Oscar and his daughter Annie to the number of his executors, and on October 19th, 1920, the will and the codicil were probated in the Orphans' Court of Frederick County.

In that will, after leaving all of his property to his wife so long as she remained his widow, he provided that she should have the "power to sell and convey the whole or any part of the same absolutely or to convey and encumber the same by way of Mortgage, Lease, or any other Lien or encumbrance or by sale and delivery of any of my said personal property, and with power to re-invest the proceeds thereof or any part thereof, in her own discretion, either in real estate, personal property, Mortgages, Stocks, Bonds or other securities;—and from and after the death or marriage of my said wife, Susan R. Gaver, I hereby direct that all of my estate aforesaid of every kind and description, real, personal and mixed, remaining in the hands, name, possession, ownership or control of my said wife, Susan R. Gaver, be sold by my Executors hereinafter named or the survivor of them, and the proceeds of the same shall be equally divided among my three children by my said wife, Susan R. Gaver, share and share alike, namely:

"To Alfred Wesley Gaver, a son, one-third; to Annie Viola Gaver, a daughter, one-third; and to Oscar Franklin Gaver, a son, one-third.

"The provision hereinbefore made for my said wife, Susan R. Gaver, is to be in full satisfaction of all other interest in my real, and personal estate, unless she shall marry again, in case she shall receive out of the property of which I may die seized and possessed or of which I may be the lawful owner at the time of my death or of any other property which she may, in whole or in part, have substituted therefor under the power to sell and

re-invest herein contained, the same amount of interest to which she would be entitled in case of my dying intestate."

On November 3rd, 1930, Susan R. Gaver, professing to be acting under that power, by her deed of that date conveyed the Airview property to Oscar for a stated consideration of $4000, and on the same day he leased it to her for a term of two years at an annual rent of $240. On November 13th, 1930, he borrowed $4000 from the Commercial Bank of Maryland, and gave to Susan R. Gaver a check dated November 3rd, 1930, drawn to her order "for estate of Geo. W. Gaver" for $4000. On November 12th, 1930, Susan R. Gaver had that check deposited in the Commercial Bank to her credit for the estate of Geo. W. Gaver, where it still remains. On the same day Susan R. Gaver executed a will in which she named Oscar and Alfred as her executors and which contained this provision: "If there be any money due me at the time of my death, from either of my said sons, Alfred W. Gaver, or Oscar F. Gaver, my will is that said debt or debts shall be cancelled, and I credit them for all favors either one has done for me during my life." On June 30th, 1931, Oscar borrowed $4000 from his mother on the joint and several promissory note of himself and his wife, payable in three years and bearing interest at four per cent.

On October 8th, 1922, Annie V. Gaver Moore died, leaving, to survive her, her husband, Louis J. Moore, Sr., and two children, Louis J. and Raymond A., all of whom reside in Virginia, and on July 11th, 1936, Susan R. Gaver died, so that there then remained surviving only two of the four executors named in the will and codicil of George W. Gaver.

Because, it is said, George W. Gaver left no personal property, the executors of his will did not apply for letters testamentary thereon until after the death of his widow. Then Alfred and Oscar, the surviving executors of his will, and who were also the executors of the will of Susan R. Gaver, applied for letters on both estates, and accordingly letters on both estates were issued to

them and in due course they qualified as executors of both wills.

. On December 2nd, 1936, Oscar F. Gaver left for record .in the office of the Clerk of the Circuit Court for Frederick County the deed of Susan R. Gaver to him, conveying the Airview property, which she had executed on November 3rd, 1930, more than six years before, and on December 9th, 1936, Alfred W. Gaver, individually and as a surviving executor of George W. Gaver, filed the bill in this case against Oscar F. Gaver to set that deed aside. In that bill, after alleging in substance the facts stated above, he charged "that the purported conveyance from Susan R. Gaver to Oscar F. Gaver was a secret and surreptitious transaction, colored with fraud and with the malicious intent on the part of the said Oscar F. Gaver to keep his brother, Alfred W. Gaver, and the heirs of his sister, the late Annie V. Gaver Moore, in complete ignorance of the said fraudulent transaction and that the failure of the said Oscar F. Gaver to record the deed from his mother, Susan R. Gaver, until after the death of his mother, or some six years after said deed was executed, was part and parcel of his deliberate plan to take advantage of his mother at the expense of his own brother, the husband and sons of his own deceased sister and the estate of his own father which he was charged to serve in the fiduciary capacity of an executor," and that "was brought about by fraud, misrepresentation and undue influence on the part of the said Oscar F. Gaver and was plainly in abuse of the confidential relationship existing between himself and his aged mother and was in derogation of his clear and lawful duty as an executor of his father's estate to preserve that estate for the benefit of the remaindermen and not to engage in individual transactions therewith for his own personal gain."

The defendant answered, testimony was taken, the case submitted and an opinion filed, in which the chancellor announced that he would set aside the deed, reserving any question as to reimbursement of the purchaser. Before that opinion was filed, however, the plaintiff asked leave

to amend his bill by striking out his name as surviving executor of the estate of George W. Gaver as that of a party plaintiff, and adding as parties defendant Zona K. Gaver, wife of Oscar, and Louis J. Moore, Sr., Louis J. Moore, Jr., and Raymond A. Moore, and by adding an offer to restore all parties to the status they respectively occupied before the execution of the deed. That amendment was allowed and made, Zona Gaver answered, notice was given to the Moores by publication, and upon their failure to appear or answer the bill was taken as confessed as against them. After the opinion had been filed another amendment to the bill was allowed, by which Alfred Gaver and Oscar Gaver, as executors of the will of George W. Gaver and as executors of the will of Susan R. Gaver, were made parties defendant. A demurrer to the bill as thus amended was over-ruled, and the court then decreed (1) that the deed be set aside, (2) that Oscar F. Gaver retain the promissory note given by him and his wife to Susan R. Gaver for $4000, that the real estate be sold and that H. Kieffer De Lauter and David C. Winebrenner, 3rd, be appointed trustees to make the sale, and (3) out of the proceeds of such sale $4000 be paid to the estate of Susan R. Gaver and the balance if any to the estate of George W. Gaver. From that decree Oscar F. Gaver has appealed.

From this statement it is apparent that the appeal submits these questions, one, whether the deed from Susan R. Gaver to Oscar F. Gaver is actually or constructively fraudulent and void; two, whether, if the deed must be annulled, Oscar F. Gaver is entitled to a return of the purchase money paid by him; and three, whether, if the deed is void, the court was authorized to appoint trustees to sell the property described in it and distribute the proceeds.

Without analyzing in detail, it is sufficient to say that in addition to those stated above, the facts embedded in the following narrative may be accepted as established:

At the time of the execution of the deed under consideration Susan R. Gaver was about seventy-seven years old,

and at the time of her death she was about eighty-three. Beginning in April or May, 1930, from some cause not shown by the record, she lost the use of her lower limbs. As a result of that disability she was for a time bedridden and while later she was able to sit up in a chair and even to move about her room, she was until her death confined to the room. Throughout that period her mind remained clear, she took a keen intelligent interest in her own affairs, and in what went on about her, although one witness did testify that at times her mental faculties seemed to be impaired, and that it would be difficult to make her understand things.

Alfred testified that "at the time she was confined to her room, which was in 1930, I think I am correct, she was in worse condition than a year or so later. She had lost the use of the left arm, practically lost the use of her legs, couldn't walk, but that condition gradually improved. After she stayed in bed a considerable time she regained the use of her left arm and she partially regained the use of her legs. She could get from her bed to the chair at the window by taking hold of the bed and chair. In 1930, when she was first confined to her room, she had to be lifted to her chair," and that appears on the whole to be a substantially accurate description of her physical condition.

She was a woman of some property, her business interests were not inconsiderable, she had at times money to invest, and investments to change, she incurred debts, she gave checks, and, acting vicariously, she deposited money, and operated a farm. Because of her disability she was unable to physically attend to these transactions, but usually in respect to them acted through one of her sons. She signed checks, but did not write them out herself, she discussed the operation of her farm, but relied upon her sons to execute her wishes, she discussed investments, but relied upon their judgment in making them, such deposits as she made were made by one of the sons, and in short she was compelled to rely upon them as her hands or agents in carrying out her will and judgment in the transaction of such business as she had.

For a time Alfred lived with her at the Airview home; but in 1924 or 1925 he left that home and went to Frederick to live. Oscar, then living in Middletown, came to live with his mother in 1932, and remained with her until her death. After Alfred left, although for a time he acted with his brother Oscar in operating the farm, and was occasionally consulted about other matters, probably because he was at hand, she came to rely upon Oscar to transact her business and do what she wanted done, and she had great confidence in him.

Until their mother's death the relations between her and her sons, and between the sons themselves, were cordial, pleasant and apparently affectionate, as were the relations between her and the family of her deceased daughter Annie. Alfred, after he went to live in Frederick, visited his mother frequently, and Oscar, with whom she lived, saw her almost constantly from 1932 until her death, and he saw Alfred also from time to time.

Oscar, having testified that he had borrowed $4000 from his mother to pay the note which he had given to the Commercial Bank to raise the $4000 to pay for the property, was asked on cross-examination whether he gave her any evidence of the indebtedness, and he replied that he had given her a note which he found among her papers after her death. And he then gave this testimony:

"Mr. Gaver, under your mother's will is your brother Alfred W. Gaver, a co-executor? A. He is an executor if he qualified. I suppose he qualified. Q. Don't you know he has qualified? A. I presume he has. Q. Don't you know he has? A. Well under the terms of the will. Q. That doesn't answer the question. A. Yes, he qualified. Q. Then why did you keep on saying you presumed when you knew all the time he qualified? Let me ask you this question: Has Mr. Alfred W. Gaver, co-executor of your mother's estate, any knowledge of the existence of this note of $4000? A. I don't know whether he has or not. Q. Did you ever reveal to him you had come across a note for $4000? A. He was told after my mother's death.

Q. By whom? A. By me. Q. That there was a note for $4000? A. He was told about the transaction. Q. When? A. When we administered my mother's estate. Q. That was after her death of course? A. It wasn't settled before she died. Q. Was he told that in your mother's estate you had come across your note to her dated some time in 1931 for $4000? A. Well no, it was never inventoried, like a lot of other things were not inventoried like the bank accounts and things like that. Q. Have there been any inventories in your mother's estate filed? Has there been an inventory of debts due filed? A. Not yet. I haven't looked lately. Q. You are one of the executors? A. I haven't looked, I told you. I haven't filed any. Q. Who discovered this note of $4000 after your mother's death? A. I discovered it among her possessions. I knew it was in there. After I gave it I knew it was there. Q. Did you apprise your brother, who was your co-executor, of the existence of this note? A. I told you a while ago I did. Q. Did you apprise him of the existence of this note? A. I told him I had borrowed that money. Q. Just answer the question. Did you tell him about this note? A. As far as I know, the best that I can remember, I told him. Q. You don't remember definitely, whether you did or did not? A. I said I believe and I am sure I told him."

And later, when cross-examined concerning the recordation of the deed, he testified as follows: "Q. When was the deed recorded for this property? A. I don't know. Q. You don't know when the deed for the property you now own was recorded? A. No, I don't. Q. Don't you know as a matter of fact, as set forth in the bill, it was not recorded until December, 1936? A. I don't know what you set forth. I don't know when it was recorded. It was entered for record long before that. Q. Don't you know a number of years elapsed before it was recorded? A. Yes I know it. Q. And you say you visited your mother every day, some times twice a day? A. Yes, sir. Q. (The Court) When did you give the deed to Mr. De Lauter? A. After my mother's death. The deed was in

my possession, Judge. * * * Q. What was the relationship between you and your brother Alfred in 1930? Was it friendly? A. As far as I know it was friendly. Q. You would be likely to know wouldn't you? You would know whether you were on friendly terms with your brother, wouldn't you? A. I answered you once. Q. You didn't answer that question. I said you would likely know whether you were on friendly terms? A. I said yes. Q. Did you at any time, after delivering this deed from your mother, advise your brother of this transaction till your mother's death? A. How is that? Q. Did you at any time advise Alfred of this transaction whereby you purchased the property from your mother until after your mother's death? A. No, sir."

On behalf of the appellant seven witnesses were called to testify as to the value of the property at the time it was conveyed to Oscar. Of these witnesses Lewis F. Kefauver, who had sold the land to George W. Gaver in 1889, valued it at $7000; Leslie Coblentz, a lawyer living in Fairview and familiar with land values there, valued it at $6500; Gilmore Flaut, a real estate operator, said that it was worth $6000; John W. Holter, a former county commissioner, said it was worth $6500; Walter L. Ramsburg, who lived in Airview and was familiar with sales of property in that neighborhood, placed the value of the Gaver property at $7000; John L. Routzahn, president of the Middletown Bank and the Grangers Insurance Company, valued it at $8000, and Alfred Gaver at $8000. For the defendant, C. Herman Coblentz, living on a farm near Middletown and familiar with local land values, valued the property at $4500; Grayson H. Mercer, who carried on a real estate and insurance business in Frederick and had bought and sold real property throughout the county, at $4200; a retired mail carrier living in Middletown at "perhaps $4200, $4500, $4800, around there"; and Oscar Gaver at $4000, and it also appeared that in 1927 the property was assessed at $5000.

In connection with these facts the first question to be answered is whether Oscar Gaver stood in a confidential relation to Susan R. Gaver, his mother, for if he did, he carried the burden of showing that the transaction under which he acquired title to the Airview property was fair and just; if he did not, the burden was upon the plaintiff to show that it was fraudulent. The clear and unmistakable purpose and intention of George W. Gaver, manifested in his will, was that Susan R. Gaver should hold the property which he owned at his death or any re-investment thereof for her use until her death or marriage, with power to sell or otherwise dispose of the same or any part thereof and to re-invest the proceeds of such disposition, and that, at her death or remarriage, the property or the proceeds of any disposition thereof or any property in which the same might be invested should be sold and the proceeds of such sale be distributed in equal shares to his children. She held the property therefore as a trustee for the remaindermen. *McClernan v. McClernan*, 73 Md. 283, 288, 20 A. 908; *Miller on Construction of Wills*, sec. 253, nn. 7, 8; *Meister v. Meister,* 121 Md. 440, 88 A. 235; *Russell v. Werntz,* 88 Md. 210, 44 A. 219; *In re Bauernschmidt's Estate,* 97 Md. 35, 54 A. 637. *Tyson v. Tyson,* 31 Md. 134, where it was held that a provision for re-investment annexed to a power to convert was suggestive rather than peremptory, is not inconsistent with that conclusion, for there the court was influenced by the fact that the limitation over applied only "in case no sale or other disposition should be made * * * under the aforesaid powers * * *," a circumstance which distinguishes it from such cases as this as well as from those cited above.

As a trustee Mrs. Gaver was under a duty to exercise her power to sell fairly and impartially for the equal benefit of all the remaindermen, and any grant of a gift, benefit, or advantage to one remainderman at the expense of the others would constitute a breach of that duty. 65 *C. J.,* 648; 26 *R. C. L.* 1280, 1281; *Calvert v. Carter,* 18 Md. 73.

In considering the relation between Oscar and his mother that fact is not without significance, for he knew of the trust, since he was named as an executor in the will which created it, and while he himself had not, when the deed was executed, qualified as an executor, he knew that he was dealing with a trustee. He was therefore bound to know that the trustee could not validly consummate a transaction which violated that duty.

This is not one of that class of cases where the relationship between the parties to a conveyance, itself and without more, raises a presumption that it is invalid, as in the case of a voluntary conveyance from a child to a parent (*Whitridge v. Whitridge,* 76 Md. 54, 73, 24 A. 645, cited in *Bauer v. Bauer,* 82 Md. 241, 242, 33 A. 643, and *Brown v. Mercantile Trust Co.,* 87 Md. 377, 390, 40 A. 256), but falls rather in that class referred to in this language in *Bauer v. Bauer, supra:* "But a voluntary conveyance of property from a parent to a child rests upon a different principle, and is not *prima facie* void. It turns, says Mr. Pomeroy in his work upon *Equity Jurisprudence,* upon the exercise of actual undue influence and not upon any presumption of invalidity. A gift from parent to child is certainly not presumed to be invalid. 2 *Pom. Eq. Jur.,* sec. 1399. If, however, the confidential relation is shown by competent proof to exist, then the burden is imposed upon the grantee to show that the transaction was a righteous one." See also *Upman v. Thomey,* 145 Md. 347, 360, 125 A. 860; 4 *R. C. L.* 492; 9 *Am. Jur.* 366; *Pomeroy Eq. Jur.,* sec. 956 *et seq.;* 12 *C. J. S., Cancellation of Instruments,* secs. 33, 91. But once the relation is proved, the principles expressed in the following quotations apply: "If a person stands in a fiduciary relation to another, having rights and duties which he is bound to exercise for the benefit of that other, he will not be allowed to derive any profit or advantage from the relation between them, except upon proof of full knowledge and consent of such other. In accordance with these principles, contracts or conveyances made by aged parents in favor of their children, and by children in favor of

their parents, are objects of close scrutiny. If they are not reasonable, and were not entered into with perfect good faith, and especially where the original purposes for which they have been obtained are perverted or used as a cover, they will be set aside, save as to third persons, particularly when made without the benefit of competent and independent advice. The same principle applies to guardians, *quasi* guardians, and confidential advisers, to trustees in dealing with their *cestuis que trust* or their *cestuis'* property, to husbands and wives in their relations with each other, to priests in their relations with parishioners, and to the promoters of a corporation in transacting business with their companies." 9 *Am. Jur.* 366. "Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed." *Pomeroy Eq. Jur.*, sec. 9566, page 2040.

The conclusion that Oscar stood in a confidential relationship to his mother seems unavoidable. Assuming that her mind was clear, physically she was helpless. Oscar was her only available contact with the world beyond her room. She relied upon him for the management of her affairs. She signed checks, but he drew them, she made no investments except upon the advice of her sons, in later years usually that of Oscar, he deposited her money in bank, and while she signed checks she signed them in reliance upon the information and advice of others, as appears from this testimony given by Oscar: "Q. Mr. Gaver, when checks or any papers were taken to your mother by you or your brother Alfred to sign, what would she do? A. It was generally explained to her what it was for, at all times as far as I know. I don't know what he did. I always explained it to her. Q. If you didn't

explain would she go ahead and sign? A. She never signed for me till she knew what she was signing. Q. The transaction would have to be explained to her? A. Yes sir." He managed the farm and sold the crops. Alfred testified that Oscar kept her bank books, and Oscar did not contradict him.

Without attempting to add another to the many definitions of the term, it is enough to say that such a relation may be presumed whenever two persons stand in such a relation to each other that one must necessarily repose trust and confidence in the good faith and integrity of the other. 12 *C. J.* 420. In *Brown v. Mercantile Trust Co.,* 87 Md. 377, 390, 40 A. 256, the court, after denying that such a relationship may be inferred from the mere fact of a special agency, nevertheless said: "In *Brooke v. Berry,* 2 Gill 83, and in *Todd v. Grove,* 33 Md. 191, the agency extended to the transaction of all the business and the management of all the affairs of the principal; and, this being so, when the gift was obtained, it was held that the facts brought these cases clearly within the rule of equity governing transactions between parties standing in a confidential relation."

Assuming then that Oscar did stand in a confidential relationship to his mother, the inquiry is, Was the transaction under which he took title to the Airview property a fair one? Some reliance is placed by the appellant upon Mrs. Gaver's statement that "Oscar gets the place anyway," but when it was made Oscar already had the place, so that it was a mere statement of fact, not of a wish or purpose. But apart from that, if she decided that the property should be sold, it was her duty to sell it for the best price obtainable, whether to Oscar or another. That she did not do that is shown by a clear preponderance of the proof. For the appellee, excluding the testimony of Alfred, six witnesses valued the property at from $6000 to $8000, or considering this composite testimony an average valuation of about $7000. For the appellant, excluding Oscar, three witnesses valued it at from $4200 to $4800, or averaging their estimates an average valu-

ation of about $4500, and the property was assessed at $5000. These estimates were, it is true, mere opinions, but they were the opinions not of professional witnesses but of substantial business men, familiar with the property, with knowledge of local land values, most of whom had had experience in valuing real property. If the valuation of the appellant's witnesses is accepted, the remaindermen will lose one-eighth of the value placed on the estate by Oscar, while if that of the appellee's witnesses is accepted they will lose three-fourths of that value, as a result of the transaction, so that in either case they must suffer a substantial loss if it is permitted to stand.

Moreover appellant's suggestion that the sale was made in good faith receives no support from the circumstances attending it. The appellant not only failed to mention it to his brother, who was a remainderman, and whom he saw frequently, but he did not record the deed until after his mother's death, some six years after it was executed. If, as he testified, he "had orders not to record the deed," those orders could only have come from his mother and would indicate that she too wished to keep the transaction secret.

In view of these facts this court concurs in the conclusion of the chancellor that the deed is invalid and must be set aside.

We are unable, however, to concur in those provisions of the decree which deal with the loan from Mrs. Gaver to Oscar, and with the sale of the property. Those provisions in effect annul and strike down a contract and certain provisions of two wills, no one of which is in any way attacked or questioned in either the proceedings or the evidence in this case, but which are, in so far as anything in this case appears to the contrary, valid, subsisting, and enforceable documents.

It is no part of the ordinary jurisdiction of a court of equity to revise and correct the probate of wills. *Chase v. Winans*, 59 Md. 475; *Pomeroy Eq. Jur.*, secs 913, 120; 68 *C. J.* 943; 40 *Cyc.* 1251; 21 *C. J.* 120 *et seq.* Nor will they ordinarily intervene in the administration of estates

by orphan's courts, in the absence of special circumstances requiring the intervention of a court of chancery to do complete justice or give adequate relief. 21 *C. J., Equity,* sec. 101, note 98 (f).

The decree in this case directed that the promissory note given by Oscar F. Gaver and Zona K. Gaver to Susan R. Gaver for $4000, payable in three years and bearing interest at four per cent, be returned to Oscar F. Gaver, but made no provision for returning to him the $4000 which he paid for the property under the deed which has been annulled, but instead directed that out of the proceeds of any sale of the property $4000 should be paid to the estate of Susan R. Gaver, to reimburse it. That is to say, it assumed that because Susan R. Gaver loaned her son $4000 on the note of him and his wife, that she bought and paid for the property, and the result of it was to take from Oscar his right to a return of the purchase money, and cancel his debt to the estate as a nullity. Manifestly there are no circumstances in this case which gave the court the power to so deal with the note and the purchase price. It is axiomatic that one who seeks the rescission of a deed or other instrument on the ground of fraud, mistake, or the like, must restore the consideration paid by the defendant, except where, through defendant's fault, restoration is impossible, or where for some reason the plaintiff is entitled in any event to retain the consideration, or where it is without value, or is a past due debt. 9 *C. J.* 1210; *Linthicum v. Thomas,* 59 Md. 574; *Smith v. Townshend,* 27 Md. 368; *Cumberland Coal Co. v. Sherman,* 20 Md. 117; *Long v. Long,* 9 Md. 348; *Griffith v. Frederick County Bank,* 6 G. & J. 424; 9 *Am. Jur.* 384; 12 *C. J. S., Cancellation of Instruments,* sec. 44; *Taylor v. Whitehurst,* 151 Md. 621, 632, 135 A. 428. In this case the property was sold as property of the estate of George W. Gaver, the purchase price was deposited to the credit of that estate, the appellee filed the bill to set the deed aside on the ground that it was a fraud against that estate, the only relief prayed by the appellee was that the deed be set aside, and that a de-

cree be entered restraining alienation of the property by the defendant, and in his amended bill he expressly offered to restore all parties to the status occupied by them before the deed. The decree should therefore, under the pleadings and proof in this case, have prescribed, as a condition precedent to the annulment of the deed, the restoration of the purchase price to Oscar F. Gaver.

Nor had the court the power to determine the status or the extent of Oscar's indebtedness to his mother's estate. That estate is in process of administration by the Orphans' Court of Frederick County, which is authorized to require the executors thereof to account for all the assets of the estate, of whatever character. Nor had it the power to annul that provision of the will of Susan R. Gaver under which she directed that any debts due her by either of her sons be cancelled. That will stands unimpeached, the evidence shows that the testatrix did lend to her son Oscar $4000, that the transaction was fair on its face, since the will has been probated and both executors have qualified, it must be presumed, until the contrary is proved, that she was capable of making a valid will, her mental capacity is not questioned, she undoubtedly had the right to give to Oscar or another such part of her estate as she wished, and she had the same right to cancel any debt which he owed her. Nor had it the power to order the property sold and appoint trustees to make the sale, for, under the will of George W. Gaver, that power is given to his executors. No such relief is prayed by the appellee, there was no proof that either would refuse to execute the power granted by the will, no application had been made to remove either, the jurisdiction of the Orphans' Court is ample to permit and to compel the adequate execution of the power, no grounds have been shown for the intervention of a court of equity or its interference with the will and purpose of the testator, and the Orphans' Court has assumed and is exercising jurisdiction of the administration of the estate. Ordinarily courts of equity will not interfere in the administration of estates by a probate court, except

to remedy some evil or establish some right which such courts are powerless to grant or establish. Code, art. 93, sec. 299; *Lochary v. Corrigan*, 132 Md. 371, 373, 103 A. 1006; *Macgill v. Hyatt*, 80 Md. 253, 256, 30 A. 710; *Woerner, American Law of Administration*, sec. 156; *Wright v. Williams*, 93 Md. 66, 69, 48 A. 397; 21 *C. J., Equity*, secs. 98-104 inc. There was error, therefore, in so much of the decree as directed a sale of the Airview property and appointed trustees to make such sale.

While the record contains many exceptions to rulings on the admissibility of evidence, they are not referred to in the briefs filed in the case and need not therefore be considered. It follows, too, from what has been said, that the demurrer to the amended bill of complaint was properly over-ruled. The bill stated a case for equitable relief, and the Moores have a direct interest in the subject matter of the suit. The decree will, therefore, be reversed in part and affirmed in part.

> *Decree affirmed in part and reversed in part, and case remanded for final decree in conformity with the views expressed in this opinion, with costs to appellant.*

PARKE, J., filed a separate opinion as follows, in which JOHNSON, J., concurred.

The court will readily infer, within a wide range of circumstances, a confidential or fiduciary relation which imposes upon the party benefited the duty to make full disclosure and to exhibit extreme good faith. While in this case there is an alleged mother and son upon whom she largely depended for counsel and assistance in her affairs, she was, in my judgment, competent and informed of her interests and their value, and of the effect of her grant of the land to her son. There does not appear any deceit, misrepresentation, or withholding of information by her son. While I do not read the testimony as sufficient to establish anything more than the desire of a

mother to assure the acquisition by a favored son of the family residence, without disclosure; and, if the property had been owned by the mother, her preference would seem to be no ground to avoid the deed, nevertheless the fact that the mother held the property as tenant for life and in trust under her husband's will, with power to sell, rendered her not free, in the execution of her power, to indulge in her maternal preference, but bound to conserve the corpus of the trust, and, therefore, to obtain an adequate consideration for the land when sold. The testimony is sufficient to raise the question of the fairness and adequacy of the price at which the land was sold, and one of the *cestuis que trust* protests. It seems to me that on this ground the deed must be set aside, and the parties restored to their relative rights as though no sale had been made.

In the result and in the opinion, except as here noted, I fully concur.