PIRAINO ET AL. *v.* BETKA

[No. 101, September Term, 1958.]

*Decided January 20, 1959.*

*Motion for rehearing filed February 17, 1959, denied February 19, 1959.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Murray MacNabb,* with whom was *Alexander J. Lane* on the brief, for the appellants.

*John T. Coady,* with whom were *Coady & Farley* on the brief, for the appellee.

HORNEY, J., delivered the opinion of the Court.

Mary Piraino and Rose Goode (Mary and Rose, individually, or the daughters or sisters, collectively) filed a bill against Thomas J. Betka (Thomas or the son or brother) in the Circuit Court for Baltimore County for the sale of the property known as 7203 Eastern Avenue in lieu of partition. Thomas answered the original bill and filed a cross-bill against Mary and Rose alleging that the deeds by which they acquired title to a one-half interest were without consideration and were procured by unlawful means practiced upon Agnes Betka (the mother or donor). The chancellor denied sale of the property and set aside the deeds. The sisters appealed.

The parties are of Polish descent and apparently conducted their affairs in conformity with the mores of their old world ancestors. When the father died in 1925, Thomas, as the eldest son, took charge of and conducted the family affairs as head of the household. It was a closely-knit family and the mother and children lived together, even for a time after the children married. After the death of the father the family home on Kent Island in Queen Anne's County was sold and the family took up residence in Baltimore City and built a home on East Lombard Street. They lived there until 1935 when they moved to the Eastern Avenue property in Baltimore County which is the subject of this proceeding. The Lombard Street house was sold in 1944 for $4750. About $1800 was kept by Thomas to reimburse him for expenditures he had made on it out of his own funds. Another $2000 was used in renovating the Eastern Avenue property. Thomas also used about $3600 of his own money in purchasing this property, but title thereto was originally held by the mother, Thomas and Mary as joint tenants with rights of survivorship. The reason is not clear, but Rose had no interest in this property at that time. However, she and her adopted son had received the entire proceeds of $1200 when the Kent Island property was sold.

The mother and her children and the spouses of the daughters lived together for varying periods of time. In 1947 Mary married. Because the mother did not at first look with favor on the marriage, Mary released her one-third interest to her mother and brother and the property was reconveyed to them as joint tenants. Apparently Mary received no consideration for the transfer, but there was an oral agreement that when she needed money she would be paid her share.

In the summer of 1954 the mother, Thomas and Mary and her husband were still living together in a close and congenial relationship until after Thomas married on July 8. Friction soon arose between Mary and her brother's wife, and Mary decided to buy a house in Dundalk, but did not have enough money. She demanded her share of the Eastern Avenue property in accordance with the oral agreement. An appraiser fixed the value of the house at $10,000, and on August 6, 1954, Thomas gave Mary $1000 in cash to make the down payment on the Dundalk house and a check for $4000 which she deposited in a savings and loan association in a joint account for herself and her brother, but it was subsequently withdrawn and redeposited in the name of herself and her husband. On the same day the $5000 was paid to her, Mary gave her brother and mother a receipt, which stated in part that she had received the money from her brother and mother "in full payment for and [in] consideration of any and all right, title and interest of * * * [Mary] in and to the * * * property."

Mary left the home the next day. There is a dispute as to whether the mother was to accompany her. Thomas testified that Mary had said, "I had your mother for 15 years, now you take care of her." Mary denied this and testified that her mother wished to stay to protect her interest in the property. Mary's husband testified that Thomas had said "something about letting her rot," when Mary had inquired about what was going to happen to their mother. In any event, the mother stayed on for about two weeks.

Although Rose had moved away from the family home, she visited her mother frequently. As was her wont, Rose went for a visit on August 9, 1954. She testified that Thomas or-

dered her from the house when she refused to sympathize with him concerning his difficulties with Mary, but she returned with her son on August 15. Thomas was not home and his wife would not permit her to enter the house, but the mother came out and sat under a blanket in a drizzle in the rear of the house until the son returned. When he returned there was another argument. In the end Rose and her son took the mother and her clothing with them, but Thomas would not let his mother take the money she had in the house, claiming that it was his. According to Rose and her son, the mother wanted to go home with the daughter. Thomas claims that Rose told him she was only taking the mother for an automobile ride. The mother was taken to Mary's home, and there she remained until she died suddenly on August 17, 1956, of a coronary occlusion caused by myocarditis and senility. In the interim Thomas did not see his mother, claiming that he "had strict orders from [Mary] not to visit her house," which Mary denied. The next day after the mother had arrived at Mary's home, Rose's son contacted the Lawyer Referral Service and was told that Alexander J. Lane, Esq., was an attorney who could speak Polish. An appointment was made with the attorney to see the mother on the evening of August 16, 1954. Out of the presence of members of her family, the mother told the attorney—in Polish since she spoke little English—she wished to make a will and devise her interest in the Eastern Avenue property to her daughters. The next day the attorney discovered when he examined the land records that title to the property was held by the mother and son as joint tenants. He returned that evening and informed the mother, also privately, that a will would be ineffective to transfer her interest to the daughters. He further advised her that, if she wanted to accomplish that result and still retain an interest in the property, it could only be accomplished by the execution of two deeds —one from the mother to a strawman and the other from the strawman to the mother for life with remainder to the daughters. This was accomplished on August 18, and, in addition to reserving an estate for life, she also retained "full powers of disposition" during her lifetime. The attorney subse-

quently testified in court that the mother had said to him, "that is the way I want it." He further stated that at that time she talked coherently and appeared to understand everything he said to her. The daughters were present when the deeds were executed and they, or one of them, paid the attorney his fee. There was no hint of any impropriety on the part of the attorney.

Thomas attacked the execution of the deeds by charging they "were without consideration and were procured by fraud, deceit, duress and undue influence practiced" on the mother, who was then 87 years of age, that she "did not know what she was signing," and that she "was at that time incapable of executing a valid deed or contract by virtue of her advanced age and feeble and senile condition." He further alleged that his sisters "stood in a highly confidential relationship to" the mother and that "the execution and delivery" of the deeds after Mary had received the sum of $5000 from him "was * * * part of a scheme to defraud * * * [him] of a one-half interest" in the property. Presumably he meant his mother's one-half interest which he would have received at her death if she had not broken the joint tenancy by conveying her interest to the daughters.

The chancellor found that the deeds were "procured with undue haste and influence by the daughters * * * when the mother was old, senile, uninformed, harassed, forgetful, deceived and bewildered and without ability to make a rational decision," and that "[t]he old lady was the victim of her daughters' conspiracy."

Two doctors testified as to the physical and mental condition of the mother. One (Dr. Michael Abrams) had been in attendance for three days in October of 1952. The other (Dr. J. Howard Burns) made three visits to treat the mother in the summer of 1956. Neither had been in attendance on or about August 18, 1954, the date the deeds were executed.

Dr. Abrams, in 1952, had found a "very senile old lady," whose memory was bad, and who could not take care of herself. He defined "senility" as "an aberration of mental faculties due to a physical condition," and stated that in his opinion a person who was senile would get progressively worse as

time went on, and he did not think there was any chance of her health and mental condition improving. On the other hand, Dr. Burns, in 1956, had found that the patient seemed to be rational, and he did not notice anything that would indicate her mind was unstable. She was senile, but he defined senility as being aged in a physical sense as well as in some mental aspects. He could not state whether she was capable of executing a valid deed or contract. She was in bad physical condition, with high blood pressure, a heart murmur, swelling of the legs and a large varicose ulcer. She had suffered a fractured hip nineteen years before which still affected her ability to move around even with crutches.

Both Thomas and his wife testified that the mother had a bad memory and could not understand them at times. The daughters and friends of the mother testified in substance that, while the mother did forget those she had not seen for sometime, she would nevertheless remember them after being reminded of who they were.

Among other things, Thomas contends that Mary perpetrated a fraud on him when she accepted $5000 from him on August 6, 1954, and then, within twelve days thereafter, received—together with her sister Rose—a conveyance of the mother's one-half interest in the property remaining after the expiration of the life estate reserved to the mother. While he does not definitely say so, Thomas apparently seeks the specific performance of an agreement he intimates Mary made with him on that occasion.

It appears that it was the family's continued attachment to, and the eventual collapse of, an old world custom which, when applied to a new world intrafamily agreement—partly in writing, partly oral, and partly *unspoken* as was customary —was principally responsible for the disagreement which arose between Mary and Thomas, and sparked the somewhat confused and uncertain facts in this case. There is no doubt, as we read the record, that Mary, in consideration of the oral promise of the mother and brother to pay her for her one-third—or one-half—share of the property at some future time, released her interest in 1947 to the mother and brother. It was also quite likely that there was some sort of an agree-

ment in 1954, as Thomas vaguely claims there was, between Mary and Thomas, and perhaps the mother—other than the written receipt Mary gave them when she was paid the $5000 by her brother—to the effect that from and after August 6, 1954, Thomas was to be the sole owner of the property subject only to "a life estate" in the mother. But the existence of such an agreement, or of any agreement for that matter, simply cannot be gathered from the record. Even if there was a breach of good faith on the part of Mary, Thomas was without a remedy absent proof of an ascertainable agreement between them.

The brother further contends (i) that the mother was incapable of executing a valid deed or contract; (ii) that execution of the deeds was obtained by undue influence; and (iii) that the confidential relationship between the mother and Mary was abused so as to constitute a fraud on the mother when the daughter induced her to execute the deeds referred to. Although she was made a party to the suit, Rose was not specifically charged with having done anything other than to escort the mother from the home of the brother to the home of Mary.

There is a presumption that every person is sane and has capacity to execute a valid deed or contract or a will. See *Masius v. Wilson*, 213 Md. 259, 131 A. 2d 484 (1597); *Cronin v. Kimble*, 156 Md. 489, 144 A. 698 (1929). Evidence of incapacity must relate to the critical date. Evidence of competency may extend further afield and relate to periods either before or after the critical date. *Masius v. Wilson, supra.* There is nothing in the record tending to show that the donor lacked capacity on August 18, 1954, when the deeds were executed. The testimony of Dr. Abrams to the effect that the donor was very senile and that her condition would get progressively worse related to a period two years *before* the critical date. The testimony of Dr. Burns related to a period two years *after* the critical date. As of then he found the donor to be rational and mentally stable though somewhat senile, but he did not know whether she was capable of executing a valid deed or contract. The unchallenged testimony of some of the lay witnesses to the effect that the donor had

a bad memory and could not understand what was said at times, assuming it related to the critical date, did not necessarily evidence incapacity. *Masius v. Wilson, supra; Sellers v. Qualls,* 206 Md. 58, 110 A. 2d 73 (1954). On the contrary, the unchallenged testimony of the other lay witnesses was to the effect that the donor was competent.

Whether the execution of the deeds was obtained by the exercise of undue influence must depend on whether her act was voluntary and unconstrained at the time the deeds were executed. See *Somers v. McCready,* 96 Md. 437, 53 A. 1117 (1903). The only evidence was to the effect that it was the donor who wanted the transfers made, and it was she who told the attorney, when he explained to her the effect of the deeds, that "that [was] the way [she] wanted it." There is no evidence that the daughters, or either of them, interfered with the donor exercising her own judgment. See *Kennedy v. Kennedy,* 124 Md. 38, 91 A. 759 (1914). In any event, the burden of showing undue influence was on the brother who sought to invalidate the gift, and he failed to do so. See *Williams v. Robinson,* 183 Md. 117, 36 A. 2d 547 (1944).

Even, if we assume, without deciding, that there was a confidential relationship between Mary and her mother, the burden would then be on Mary to show the fairness of the transaction, but we find nothing to show that the gift was improvident or the result of coercion.

While the deed conveyed remainders in a one-half interest to the daughters, it reserved to the mother an estate for life therein, and, which is more important, the mother retained full power to make any other disposition of the one-half interest she might choose during the remaining years of her life. So that in fact, *so far as the donor was concerned,* there was no appreciable difference between her status as a tenant for life with a power of disposition before death and her status as a joint tenant with a right to break the tenancy whenever she might choose to do so during her lifetime, other than the remote possibility that she might survive her son and become the sole owner. In addition to this, the donor had the benefit of competent and independent counsel who could speak

her native tongue. The only evidence produced indicates that the donor was not coerced in any manner, and apparently knew and understood what she was doing.

As we said in *Williams v. Robinson, supra,* at p. 122:

> "The law concedes to every person of sound mind the right to dispose of his property in any lawful manner that he may deem proper; and after he has voluntarily conveyed property rights without fraud or imposition upon him, equity will not annul the deed * * *."

For the reasons stated we think the chancellor was clearly wrong when he set the deeds aside on the evidence. Maryland Rule 886. The decree must be reversed, and the case remanded for the entry of an order dismissing the cross-bill and for further proceedings under the original bill.

*Decree reversed and case remanded for the entry of an order dismissing the cross-bill, and for further proceedings under the original bill, the appellee to pay the costs.*