## AKIN *v.* EVANS, Executor

[No. 91, September Term, 1959.]

126

*Decided December 14, 1959.*

The cause was argued before Brune, C. J., and Henderson, Hammond, Prescott and Horney, JJ.

*Leonard H. Lockhart,* with whom were *Hyman Ginsberg* and *Ginsberg & Ginsberg* on the brief, for the appellant.

*Floyd J. Kintner* for the appellee.

Hammond, J., delivered the opinion of the Court.

The chancellor set aside a deed from an elderly mother to an adult son in a case brought after the son had died, and heard and decided after the mother and the lawyer who had prepared the deed had also died.

The chancellor based his action on a confidential relationship between the mother and the son in which "his words of persuasion would be likely to have undue influence upon his mother," and on the finding of mental incapacity of the mother at the time of the execution of the deed, and determined that the defense of laches was inapplicable, first primarily, on the erroneous ground that suit had been brought before the son had died and, on rehearing (when the error was called to his attention) on the ground that the mother had acted with reasonable diligence after she became fully aware of the significance of her act in signing her property over to her son, a ground which he had also relied on in his first opinion.

Mrs. Agnes Akin's home long had been in Warwick, Cecil County, where her son and daughter, both married, also lived. In 1937 she had purchased for $1,000 an approximately half acre lot in Warwick on which were two small frame houses. She lived in one of the houses and her son Walter and his family lived in the other. In 1952, when she was over sev-

enty years old, she remarried. Her new husband, Harrison Gilner, lived in Philadelphia. After her marriage to Mr. Gilner, she generally concealed the fact that she had remarried and continued to use the name of Agnes Akin. She lived part of the time in Philadelphia with her husband, and part of the time in her house in Warwick. In the summer of 1956 she was in ill health, suffering from congestive heart trouble, with phlebitis and dropsy. Her husband drove back with her in a taxi to her house in Warwick and then returned to Philadelphia. She remained in Warwick during the summer. Her wants were attended by a colored woman, and her son and his son, then about sixteen years old, slept in the house with her when otherwise she would have been alone.

On August 25, 1956, she executed a deed to the Warwick property to her son Walter and his wife, Catherine H. Akin, as tenants by the entireties. The deed which conveyed the lot as two parcels, separately described, had been prepared by a lawyer in Elkton. In it the grantor is described as Agnes Akin, widow. Her husband did not join in the deed and had no knowledge of it until long after its execution. It was signed about nine-thirty in the evening in the kitchen of Mrs. Gilner's home in the presence of the son and his wife and of a notary public and a friend acting as a witness, and was promptly recorded by the lawyer who had prepared it. After the execution of the deed, Mrs. Gilner continued to live in her home and the son in his.

In June, 1957, the son died. At the end of October, 1957, a tax assessor who came to Mrs. Gilner's house told her and her husband that the property was in the names of Walter and Catherine Akin. He said that both seemed surprised to hear it (the husband testified that this was the first time he had known that the property had been transferred).

Soon after the assessor's visit, Mrs. Gilner consulted a lawyer in Elkton in regard to the matter, and some months after that, another lawyer, who on April 2, 1958, filed suit to set aside the deed.

Mrs. Gilner died before the case came to trial, having given a deposition which is in the record but which was not offered in evidence. The lawyer who drew the deed also died.

The complainant offered testimony from a niece of Mrs. Gilner and a friend of the niece that on September 8, 1956, some two weeks after the deed had been executed, Walter Akin brought his mother down to Baltimore to visit her sister, the niece's mother. At that time, they said, Mrs. Gilner complained to the sister that she had been forced to deed the property to Walter because he had told her that if she did not he would not give her anything to eat. Both testified that Walter, in a restaurant in Baltimore, had told the niece and her friend that he had made his mother sign the property over to him, and that he had gotten control of her money and jewelry. The niece also testified that on this occasion Walter Akin had told her that he would like to find a way for his mother to get a divorce from Harrison Gilner.

A week later, on September 15, the niece and the friend took the mother to Warwick to visit her sister, Mrs. Gilner, who told them, the niece and friend both testified, that she had deeded the property over to Walter and was sick about it and that he had threatened not to give her anything to eat if she did not.

A doctor called by the complainant said that he had attended Mrs. Gilner on August 24, 1956, and in his opinion she was not competent on August 25, the day of the making of the deed, to make a decision or to execute a valid deed or contract.

The respondents produced a notary public, a business woman of the community, who said she had been summoned from her store to take the acknowledgment, that she had known Mrs. Gilner for over twenty years, that upon going into the house, she found the son and daughter-in-law and the witness, Mr. Carroll, an old friend of Mrs. Gilner, that she had asked Mrs. Gilner whether she wanted her to sign some papers and that Mrs. Gilner had replied yes, a deed, but that she, Mrs. Gilner, would have to go into the kitchen so that she could sign on the table, that she did go into the kitchen, that the notary read the acknowledgment to Mrs. Gilner word for word and asked her if she was ready to sign the deed, and that she signed the deed. After the deed was signed, notarized and witnessed, Mrs. Gilner asked the

notary if she wouldn't sit down, inquired about her mother and aunt by name and talked about them, and said "Tell them to come to see me some time." It was the notary's definite impression that Mrs. Gilner's mind was clear. The visit lasted ten or fifteen minutes.

The witness Carroll said that Mrs. Gilner had told him that the properties were being transferred to Walter and his wife and that "She knowed what she was doing * * *. She had a good mind * * *. She had her right mind, dern right."

The sixteen-year old grandson, who lived next door, said that in the early part of 1957 his grandmother told him that she had signed the deed to his father and mother and that his family would always have the house they were living in. A married granddaughter, Walter's child, said that in December, 1956, when she was visiting there, her grandmother told her that she had deeded the properties over to her father and mother and that she didn't want her daughter and her husband to know about it.

We think the evidence of confidential relationship inconclusive. No presumption of such a relationship arises in the case of a gift from a parent to a child. The burden of proof is on the party alleging the relationship to prove it. There was no showing whatever that any such relationship existed before Mrs. Gilner came back to Warwick in the summer of 1956. She was not dependent on her son financially. Rather, the signs point the other way. Apparently she had let her son live in his house rent free while she lived in her own and took care of herself financially and otherwise. There is indication in the record that she had not insubstantial sums of money in the bank and that she had jewelry of value. She seemingly attended to her own affairs, as indicated by the fact that she took out and paid for insurance on the houses even after the execution of the deed. When she returned to Warwick in 1956 she was not dependent financially on her son, nor did she rely on him entirely or even primarily for the taking care of her other needs. She was attended to by a colored woman who apparently had done this over the years. She ordered her own groceries by telephone and the ministrations of her son seem to have been no more than occasion-

ally sleeping in the house when she otherwise would have been alone. No unusual reliance would seem to have been placed by the mother on the son and their relationship revealed by the record does not appear to be other than that of a normal and customary one between an elderly mother and a grown son. Compare *Masius v. Wilson,* 213 Md. 259; *Piraino v. Betka,* 218 Md. 548.

If no confidential relationship was proven, the testimony would seem clearly to fall short of that necessary to show that undue influence caused the execution of the deed. If the burden of proof of undue influence remained on the complainant, as it would if confidential relations were not properly proven, the invalidity of the deed would not be established except by proof of coercion, that is, "that degree of importunity which deprives a testator of his free agency, which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act." *Sellers v. Qualls,* 206 Md. 58, 70.

The testimony as to mental incapacity is equally inconclusive. True the attending physician did testify that he thought she was incapable of making decisions or a valid deed on the day in question, but his reason would seem to have been that she was so physically ill. There was no suggestion of mental disease or disorder. The doctor's expressed specific reason for believing her incompetent was that he had prescribed phenobarbitol on the 24th and that this would dull the mental faculties. He admitted that he did not know whether she had taken the phenobarbitol on the 25th (although he said that if she had taken it on the 24th she would still have a "hangover" on the 25th). In the face of his testimony that she was very sick on the 24th, he said he did not see her again until the following February and gave as his reason that Mrs. Gilner did not like him to visit her unless she called him. The medical testimony would not seem stronger than that found insufficient in *Piraino v. Betka, supra.*

Opposed to the "personal opinion" of the doctor, as he expressed it, there is the testimony of the notary public and the witness that at the time of the signing of the deed the grantor

was in complete possession of her faculties and knew exactly what she was doing. There is the further significant, although negative, fact that no relative, friend, acquaintance or neighbor was called on to give, or gave, a word of testimony as to any eccentricity, quirk, delusion, loss of memory or other indication of mental incapacity of Mrs. Gilner. All the testimony given by lay witnesses was to the effect that the grantor was mentally capable. Added to this is the affirmative fact that Mrs. Gilner apparently continued to lead as normal and active a life after the execution of the deed as one her age would be expected to do. She visited her relatives, they visited her, she continued to run her household, and she visited two lawyers and discussed her business affairs with them in 1957 and 1958. The record indicates that over a year after the deed she had a will prepared by an experienced and competent lawyer and signed it, and that some months later she had equally competent counsel draw another will which she signed.

It is on this state of the record that we must consider and decide the question of laches. It is clear that in a purely equitable action a lapse of time shorter than the period of limitations may be sufficient under the circumstances of the case to call for the invocation of the doctrine of laches. 2 Pomeroy, *Equity Jurisprudence* Sec. 419 c, (5th Ed.); Phelps, *Juridical Equity,* p. 357 (Abridged Ed.); *Lipsitz v. Parr,* 164 Md. 222, 226 (in this case the doctrine was found inapplicable on the facts but it was seriously considered although the delay was only a few weeks); *Huyett v. Slick,* 43 Md. 284 (a period of twenty-two months); *Clabaugh v. Byerly,* 7 Gill 354 (a year and five months). If the delay is shorter than the period of the statute of limitations, the defense of laches must include not only lapse of time but some prejudice to the defendant. "In equity, a presumption exists against every stale claim, because, as a general rule, persons who have a right, and know that they have it, are prompt to assert it. But they do not always do so, and therefore the circumstances of each particular case which may explain the delay, usually control the application of the rule as to laches. * * * We find the principle constantly reiterated

that each case must necessarily be governed by its own circumstances, such as the situation of the parties, the extent of their means of information, great changes in values, the want of probable grounds for the imputation of intentional fraud, the loss of evidence, and the presence or absence of impediments to the assertion of the claim." Phelps, *op. cit.,* 356, 357. Judge Phelps on page 358 goes on to say that the intervention of an important death is not an unusual characterization of a case of laches.

In *Rettaliata v. Sullivan,* 208 Md. 617, in holding that laches applied, largely because of death, the Court quoted what had been said in *Kaufman v. Plitt,* 191 Md. 24, 29: "Ordinarily the defense of laches must include not only lapse of time but also some prejudice to the defendant" and added: "The cases recognize that the death of a material witness may constitute prejudice." *Weber v. Bien,* 143 Md. 561, 567; *Dorsey v. Stone,* 197 Md. 220, 223; *Hammond v. Hopkins,* 143 U. S. 224, 250, 36 L. Ed. 134, 145.

In the case before us the three people who knew most about the matter, the mother, the son and the lawyer who drew the deed, are all dead. There is no clear evidence that the lawyer had visited or talked to the grantor but it may well be that he did or that he could have thrown some light on the case. It is to be remembered that the mother's deposition was not offered in support of the allegations of the bill of complaint, and because of her death the chancellor had no opportunity to hear the mother testify and to judge her capacity and intentions. The son had no chance to explain the events leading up to the transaction or the details as to it, or to explain or refute the statements that he is supposed to have made concerning the transfer. The record leaves no doubt that Mrs. Gilner was fully aware immediately after the transfer that she had deeded the property to her son. There is nothing to indicate that she made any remonstrance or complaint to him or that she took any action whatever with respect to the transfer until her husband learned of it, after the death of her son, and it is not an unreasonable inference that her action taken thereafter was prompted by the husband, and that she was receptive to his suggestion because of the

fact that her son had died and that then the only beneficiary of her grant was her daughter-in-law. There is nothing to show any impediment to Mrs. Gilner's ability or opportunity to do early what she did late, that is, to visit a lawyer and have suit filed if necessary. We are of the view that the delay from September, 1956, until April, 1958, coupled with the death of the principal witness, the son, is sufficient to call for the application of the doctrine of laches; *Rettaliata v. Sullivan, supra;* and that under the circumstances the complainants may not call upon a court of equity to set aside the deed.

*Decree reversed, with costs.*