MASIUS ET AL. *v.* WILSON ET AL.

[No. 163, October Term, 1956.]

(Two Appeals In One Record)

*Decided May 8, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Alexander G. Jones* and *William H. Price,* with whom were *Staton, Whaley & Price,* and *Edgar A. Jones* on the brief, for appellants.

*Stanley G. Robins,* with whom were *Robins & Robins, John B. Robins,* and *L. Creston Beauchamp* on the brief, for appellees.

HAMMOND, J., delivered the opinion of the Court.

Appealing are two sisters, unsuccessful below in their effort to set aside a deed from their mother to their two brothers made several years before her death. They alleged, and directed their proof toward showing, a want of mental capacity and advantage taken by one of the brothers of a claimed confidential relationship between him and the mother. We find

in the record enough to support the chancellor's finding that they failed in both efforts.

Mrs. Minnie Wilson lived at Eden in Somerset County. Seemingly, she had been a widow for some years and had reared and supported her two sons and two daughters on the income from real estate she owned and her salary as postmistress, a position she held until 1949. At least as early as May, 1951, when she was about seventy-four, she had high blood pressure, for which she went regularly to the doctor. In May of 1952 she had a fall causing, or resulting from, a slight stroke. She spent but a day or two in bed, and a little later went to the home of her son, Levin, in Princess Anne, where she stayed until October. On July 25, 1952, Mrs. Wilson executed the deed under attack in which she reserved a life estate in a farm owned by her and transferred a half interest in fee to her son, Levin, and a half interest for life to her son, Philip, with remainder in that half to Levin, his heirs and assigns, at Philip's death. The more militant of the daughters, Mrs. Mercer, learned of the deed from her brother Philip within three months of its execution and discussed it with her sister, Mrs. Masius, and with her mother, in an effort to have the farm reconveyed. Mrs. Mercer sought legal advice as to what could be done to bring about a reconveyance but took no action until after the mother's death in 1955, which resulted from injuries suffered when she slipped, and fell from the porch of her home. Mrs. Mercer and her husband lived with Mrs. Wilson in Eden after she returned from Levin's home, for some months until they moved out in March, 1953. Thereafter, Mrs. Wilson lived alone until her death, and the Mercers lived close by. The appellees claim, not unreasonably, that only when a jury, in a condemnation proceeding by the State Roads Commission, placed a value on the farm undreamt of when it was owned by Mrs. Wilson and when she conveyed it, was Mrs. Mercer stirred to covetous action in the suit now before us.

In seeking to show mental incapacity, the appellants produced the doctor in Salisbury who had treated Mrs. Wilson from May, 1951, until June, 1952, and again from June of 1953 on. She testified that Mrs. Wilson was not competent

to execute a valid deed or contract in July of 1952 because she lacked continuity of thought, asking the same questions several times, laughed at things that were sad and cried at things that were not sad. The chancellor may not have given her opinion full weight in light of the testimony of two witnesses that she had told them before the trial that Mrs. Wilson was sometimes hazy and at other times lucid. Each of the daughters expressed an opinion as to lack of competency, over objection. Mrs. Mercer's testimony was positive, Mrs. Masius' was qualified, even tentative. Mrs. Mercer's opinion had to be weighed, as the chancellor undoubtedly weighed it, in the light of the facts (a) that she had taken a deed of a valuable property from her mother in October of 1950, and (b) that in 1955 she had her mother sign and acknowledge a power of attorney to her, and had recorded it, after taking her mother to a doctor who, according to Mrs. Mercer's testimony, had not stated whether or not her mother then was competent. Mrs. Mercer admitted that her mother wrote and signed checks on her bank account regularly up until the time of her death. In considering Mrs. Masius' testimony, account would have to be taken of the fact that at the time discussion was had between Mrs. Wilson and a lawyer regarding the transfer of the farm, Mrs. Masius was present and participated in discussion of a then contemplated transfer to her of a bungalow owned by her mother.

The one remaining witness to want of competency was an employee of Mrs. Mercer who helped take care of Mrs. Wilson after she began to live alone. She testified as to a number of eccentricities, as well as absent-mindedness and forgetfulness, none of which, alone or in combination, would necessarily evidence incompetency. *Sellers v. Qualls*, 206 Md. 58.

Opposed to the testimony of incompetency was an abundance of testimony that Mrs. Wilson was normal, keen and fully capable mentally. She had been treated by a doctor in Princess Anne from June, 1952, to June, 1953, who had seen her often about the time the deed was executed. He testified that his treatment had reduced her blood pressure and that she was in full possession of her mental faculties and was entirely competent to execute a deed or contract. A number

of disinterested lay witnesses, who had known Mrs. Wilson well for years and who had seen her before and after the execution of the deed, testified as to her competency and business ability. They denied the eccentricities, the absentmindedness and the forgetfulness attributed to her by the appellants. Particularly persuasive was a State Roads Commission right-of-way man who had seen her three times in 1954, when seeking to acquire property for a road. He apparently had an extraordinary memory as he proved on cross-examination. He testified that she was normal and keen and had complete knowledge of her property, how it was acquired and other pertinent facts about it, and that she spoke of the farm that she had given to her sons, Levin and Philip, and explained the details to him. We think the chancellor was fully justified in his conclusion that there was no sufficient evidence of mental incompetency at the time of the execution of the deed.

Appellants strongly urge that regardless of capacity, the deed was procured by Levin in breach of his fiduciary duties arising from the confidential relationship between his mother and him. No presumption of such a relationship arises in the case of a gift from a parent to a child. The relationship must be proved as a fact, and factors which are pertinent in deciding whether it existed include the parent's advanced age, physical debility, and mental feebleness, no one being necessarily conclusive but each having weight. *Hoffman v. Rickell,* 191 Md. 591; *Tribull v. Tribull,* 208 Md. 490, 506. This Court, in several cases where an aged parent has transferred property to a child, has found that there was no confidential relationship. See *Abromaitis v. Lipinaitis,* 160 Md. 444; *Williams v. Robinson,* 183 Md. 117; *Hoffman v. Rickell,* 191 Md. 591, *supra; Meley v. DeCoursey,* 204 Md. 648, 655-656. See also *Gordon v. Rawles,* 201 Md. 503. It was shown that Mrs. Wilson frequently visited all her children and that she depended on various ones to take her where she wished to go and to help her in her business transactions when she wanted help. It may well be that there was no showing of a confidential relationship between Levin and his mother. The chancellor expressly found that the relationship had not been

established and we cannot say that this finding was unjustified. If, however, we assume, without deciding, that a confidential relationship was established, the result would not be changed, we think. If there is a confidential relationship, the burden is on the grantee to show that the transfer was the deliberate and voluntary act of the grantor and that the transaction was fair, proper and reasonable under the circumstances. *Upman v. Thomey,* 145 Md. 347, 360; *Tracey v. Tracey,* 160 Md. 306, 320; *Hoffman v. Rickell, Meley v. De-Coursey,* and *Tribull v. Tribull,* all *supra.*

We think that every such requirement has been met in the transfer before us. It was shown that while at her son's house, Mrs. Wilson talked alone to Judge Duer, then a practicing lawyer, for some three-quarters of an hour about the proposed conveyance and problems in connection with the disposition of her estate. Soon thereafter Mrs. Wilson again visited Judge Duer, accompanied by Levin and her daughter, Mrs. Masius. Again there was a full discussion as to the ideas Mrs. Wilson had for the disposition of her property and how to accomplish it. These ideas included the transfer of the farm to Levin and Philip and a contemplated transfer of a bungalow, which Mrs. Wilson owned, to Mrs. Masius—either or both transfers to be by deed or will. Because Judge Duer was about to go on the bench, he suggested that the matter had best be concluded by another lawyer. The record discloses that thereafter Mrs. Wilson visited Mr. Beauchamp, a lawyer who had practiced for many years in Princess Anne and one whom she had known for a long time, although he had not represented her before. She talked to him alone, directing him to prepare a deed of the farm to Levin and Philip, giving him the details necessary for him to make the conveyance and evidencing full familiarity with her property and what she wanted to do with it. He prepared the deed and sent it to her. She returned, again alone, because the deed was not exactly as she wanted it. As drawn, it conveyed the farm, subject to her life estate, to the two boys as tenants in common, and she wished a deed that reserved unto her a life estate and then gave one-half interest in the farm to Levin outright and the other half to Philip for life, with remainder

to Levin, his heirs and assigns, since Philip had no children. Mr. Beauchamp prepared the deed in accordance with these instructions, again sent it to her, and it was duly recorded.

There was evidence that the deed carried out a settled intention of Mrs. Wilson and that after its execution she expressed pleasure that the matter was settled to her satisfaction. Mrs. Wilson lived with Mrs. Mercer for some months after the deed had been executed and lived very close to her until her death. Although Mrs. Mercer attempted to have her mother seek a reconveyance of the property, she was unsuccessful. A lady who had known Mrs. Wilson for twenty years testified that she had heard her discuss her property many times and over a period of five or six years "time and time again" had heard her say that she wanted Levin and Philip to have the farm. She said that Mrs. Wilson said she had given Mrs. Mercer her share and would take care of Mrs. Masius another way. The witness testified that after the transfer Mrs. Wilson had told her she was glad she had been able to fix the property the way she wanted it. Another friend, with whom Mrs. Wilson had stayed for three weeks in 1955, said that Mrs. Wilson had told her that she wanted the boys to have the farm because she wanted it to stay in the Wilson family and that after the boys died, she wanted Levin's daughter to have it. A tenant of one of the apartments in Mrs. Wilson's bungalow, from whom she collected rent and to whom she gave receipts up until the time of her death—he had known her for thirty years—said she asked him in the spring of 1952 if he would like to buy the farm, but then told him not long after that she had decided to give it to the boys. The State Roads Commission man said that she had told him in 1954 of having given the farm to the boys.

We think the chancellor could well have found that there was a fixed purpose to do just what Mrs. Wilson did and that the conveyance was her free and voluntary act. We think, too, that as the chancellor found it to be, the transaction . was fair, proper and reasonable. It was shown that Mrs. Wilson felt that she had done more for her other three children than she had done for Levin. Apparently in earlier years she had been more generous to them financially and had

given each an education that Levin had not received. It was shown, too, that towards the latter years of her life she had begun a systematic disposition of her property. She did not want it to go through the Orphans' Court or be subject to tax. She gave Mrs. Masius $2,000 and left her half of a $1,000 insurance policy she had. In late 1950, she deeded Mrs. Mercer and her husband the lot in Eden on which stood the post office and store, making an agreement whereby she was to receive in return an annuity of $35.00 a month. She had set Levin up in business as an undertaker by purchasing the house in which he conducted the business, and in 1952 gave him two thousand dollars, and in 1954, some seven hundred more. Apparently, she had done nothing for Philip until making the deed in question, but the transfer to Levin and Philip was not incongruous in relation to the over-all disposition of her property. She did not strip herself when she made the deed. She retained a life estate in the farm she conveyed. She had provided for the $35.00 a month annuity from the post office property. She owned a bungalow in which there were two apartments, both of which could be rented if she lived elsewhere, and one of which could be rented if she lived in one of them, as she did the very last part of her life. She had $1,200 in bank at the time of her death, which went to Mrs. Mercer. The value of the farm at the time of the transfer was not shown but it may be inferred from the record that it was not grossly disproportionate to Mrs. Wilson's original total worth or to what she gave the other children. As in *Williams v. Robinson,* 183 Md. 117, 122, *supra,* we think that the gift could be found to have gratified Mrs. Wilson's parental instincts and to have been in accord with what she regarded as her moral obligation to the children to whom it was made. As the Court said in that case: "The law concedes to every person of sound mind the right to dispose of his property in any lawful manner that he may deem proper; and after he has voluntarily conveyed property rights without fraud or imposition upon him, equity will not annul the deed * * *."

The appellants make much of the fact that over objection the chancellor permitted Judge Duer, and a Mr. Beverly

Hitch, who had known Mrs. Wilson for forty-five years, to state that their opinion was that she was mentally capable. The rule is established in Maryland that the statement of a non-expert witness as to the sanity or insanity of one whose appearance and conduct have come under his personal observation is not the expression of mere opinion but actual knowledge of a fact. Yet the opinion cannot be given unless a proper factual basis has been laid for it. The limitation is well expressed in *Doyle v. Rody*, 180 Md. 471, 481: "But a non-expert witness is° qualified to express an opinion as to a testator's mental capacity only where the acts and circumstances, of which the witness had personal knowledge, are sufficient to form a basis for the formation of rational opinion. He must state the facts as far as he can and disclose what led to his conclusion. If the whole testimony of the witness fails to show facts sufficient to justify the conclusion reached by him, he should not be permitted to express an opinion." The presumption that a person is sane and has remained sane lasts until the contrary is established. For this reason, evidence tending to show incapacity must relate to the critical date, whereas evidence as to competency may extend further afield, both before and after the critical date. It may be that the principle that· underlies this distinction, although not articulated in the cases, has found expression and effect in the decisions as to what is a factual basis for an opinion by a lay witness. The test has been strictly applied in cases where the witness has sought to testify as ·to incapacity. *Johnston v. Schmidt*, 158 Md. 555, 566-567; *Plummer v. Livesay*, 185 Md. 450, 456-457; *Smith v. Biggs*, 171 Md. 528, 534, 535; *Sellers v. Qualls*, 206 Md. 58, 67, *supra*. In cases where the opinion of the lay witness was that the transferor was mentally sound, it has been admitted on factual bases seemingly no more extensive and detailed than those found insufficient where the opinion was as to incapacity. See *Bowers v. Kutzleb*, 149 Md. 308, 317; *Cronin v. Kimble*, 156 Md. 489, 499, 500; *Harris v. Hipsley*, 122 Md. 418, 434, 435; *Grill v. O'Dell*, 113 Md. 625, 633. In our view both Judge Duer and Mr. Hitch had built a sound enough factual platform from which to launch their respective opinions that Mrs. Wilson

was mentally sound and capable. Each related his opinion to her business experience, knowledge and capacity as revealed to him in the contacts and conversations he had with her. Different as they were in number and duration, they were sufficient, in each case, to serve as the basis for an opinion. In any event, without the testimony of either witness, there was ample evidence in the record to sustain the findings the chancellor made.

*Decree affirmed, with costs.*