## OWINGS ET AL. *v.* OWINGS

[No. 173, September Term, 1963.]

358

*Decided January 27, 1964.*

360

The cause was argued before HENDERSON, HAMMOND, PRES-
COTT, MARBURY and SYBERT, JJ.

*Stanford Hoff,* with whom were *Sponseller & Hoff* on the
brief, for appellants.

Submitted on the brief by *Brown & Weant,* for appellee.

HAMMOND, J., delivered the opinion of the Court.

The appellants, a son and daughter of an aged mother, seek
to reverse the decree which set aside a deed of trust from their
mother to them as trustees, for her benefit for life, with re-
mainder to the daughter and the transfer of one of the mother's
bank accounts to them as trustees and of another to them in-
dividually.

The appellee, Mrs. Owings, who said she was seventy-three
but, according to her daughter, was seventy-nine, had lived
some thirty-five years in one side of a double house she owned
in Westminster. The other side was rented. Her husband, from
whom she seemingly had been separated or divorced, had died.
In December 1960 she had a stroke and one leg became weak
and she suffered falls. She went to the home of her son, Theo-
dore, where she stayed for about a month. Her daughter-in-law
was not physically able to continue to lift her when she fell
and give her the care she needed otherwise while the son was
away at work. Mrs. Owings' doctor had told the children, in
her presence, that having had one stroke she was likely to have
another, which would be completely disabling and that a deed
of trust would enable the children to administer their mother's
property. The doctor also recommended that Mrs. Owings go
to a nursing home.

On January 7, 1961, the secretary of a lawyer who, at the

request of the children, had prepared a deed conveying the double house in trust, took the deed to the son's house where, in the presence of the son and daughter, she read it to Mrs. Owings, who signed and acknowledged it. The trustees signed it.

The next day Mrs. Owings was taken to the nursing home. She went unhappily, complained while she was there, and after four months left by herself and went back to her home.

The deed of trust recited that the grantor "being of advanced age" feels she can no longer properly manage the house and desires her children, the trustees, to "care for and manage the same for her use and benefit, during her lifetime * * *." The trustees are directed to pay the net rental income to Mrs. Owings "or to her use, benefit, support or care" during her life and for her burial expenses. A power to sell is given and power to use the principal of the proceeds of sale and the interest therefrom for the same purposes as the rental income. At the grantor's death the daughter is to receive the house or what remains of the proceeds of sale thereof, free of trust.

Mrs. Owings says that although the deed was read to her she did not understand anything in it and never did know what was in it until her lawyer told her after she got out of the nursing home. She testified that the secretary who brought the deed to her told her that under the deed the children "will always look after you." She says she was weak, depressed because she did not know if she would ever walk again, and "I signed it to please them."

The secretary, and the son and the daughter testified that Mrs. Owings did understand what the deed meant. While in the nursing home Mrs. Owings called the secretary to find out if there was anything in the paper she signed that could make her stay in the home.

The day after Mrs. Owings went to the nursing home, the son took her bank books and transferred her funds, totalling some $5,500, into two new accounts. The first was a checking account in the names of the son and daughter as trustees, opened with a deposit of about $2,500. The other account was a savings account of $3,000 in the names of the son and daughter individually. At the trial both the son and daughter testi-

fied that they did not know the savings account was not in trust form.

The son collected the rents from his mother's house from January to October 1961 and deposited them in the checking account. From that account some $2,300 was checked out, all for the maintenance and expenses of Mrs. Owings, leaving a balance of $679.63, according to the testimony of the bank clerk. The savings account was not disturbed. In late 1961 Mrs. Owings and her son disagreed on who should be a tenant and she, without consulting him, rented to a tenant of her choice and thereafter collected the rents herself.

Mrs. Owings' testimony was that she never authorized the transfer of her bank accounts—there was no contradiction of this statement—and indeed knew nothing of it until, at her lawyer's suggestion in late 1961, she went to the bank to investigate. The bank clerk corroborated Mrs. Owings' claim, saying that she seemed shocked and was very upset to find out she had no accounts.

The testimony of the son and daughter was that their reason for causing the execution of the deed and the transfer of the accounts was to be able to care for their mother while she lived and to insure that what remained would go to them because for several years Mrs. Owings had told them she would, if necessary, turn her property over to anyone who would take care of her.

In the early winter of 1961 Mrs. Owings consulted her lawyer. On January 3, 1962, a bill of complaint against the son and daughter was filed, seeking to avoid the deed and regain the bank accounts. The prayers were that the "alleged Deed of Trust be declared insufficient and that the money in her account in the Union National Bank be ordered returned to her." A demurrer to the bill was sustained. An amended bill was likewise held bad on demurrer. Its prayers were that the deed be declared void and the money ordered redeposited in the complainant's name. A demurrer to a second amended bill (signed only by the complainant) was overruled. This bill contained no prayer for relief other than a request that the court "when it again sustains the Demurrer to this Amended Bill of Complaint, pass an order requiring the Defendants to pay the costs

in these proceedings and to pay the costs of preparing the papers for the Court of Appeals" because she is without funds to pay such costs.

The appellants say the second amended bill was bad because it did not state a cause of action and did not specify the relief sought "as required by Rule 370 a of the Maryland Rules of Procedure."

We think the allegations of the challenged bill that the son took her bank books without her knowledge or consent, withdrew her money and that while she was "injured and unwell," in the home of her son, she was induced without knowing what she was doing to sign the deed, were enough to set forth with reasonable certainty, clearness and accuracy the nature of her claims against her children, that because of her condition and the surrounding environment and actors she had been induced by dominance to transfer property she would not voluntarily have transferred.

The failure to include prayers for relief in the final draft of the bill of complaint is not fatal, we think, under the circumstances. Although an amended bill, complete in all its parts and plainly intended as a substitute for the original bill and so accepted by the parties, will be taken as the only bill before the court, the general rule is that an original and amended bill are treated as one entire bill and as constituting, in fact, but one record and, after a bill has been amended, thereafter the proceedings are on the original bill so amended. *Walsh v. Smyth,* 3 Bland 9, 20; *Miller, Equity Procedure,* Sec. 188; *Conroy v. Agricultural Assn.,* 165 Md. 494, 504. This rule has been applied to prayers. *Upman v. Thomey,* 145 Md. 347, 361-362; *England v. Gardiner,* 154 Md. 510, 513. We think the prayers for relief in the earlier bills may be read into the final amended bill.

Judge Boylan held that the deed was of no effect because it was not acknowledged by the trustees. We think the signing and acknowledgment by the grantor, and the timely recording of the instrument met the applicable requirements of Code (1957), Art. 21. "It has long been settled that if two parties enter into an indenture or agreement intended to be signed and sealed by both, but in fact signed and sealed only by one, that

it will be the covenant of him who has signed and sealed." *Western Md. R. R. Co. v. Orendorff,* 37 Md. 328, 335; *Eastern Ave. Corp. v. Hughes,* 228 Md. 477, 479. See also 1A *Bogert, Trusts & Trustees,* Sec. 150; *Restatement, Trusts 2d,* Sec. 35; *Stewart v. Redditt,* 3 Md. 67, in which a bill of sale in the nature of a trust agreement (which the court analogized to a deed and which was signed and acknowledged by the grantor and signed by the grantee-trustee) was held valid. Mrs. Owings did all that she was required by law to do as grantor. The grantees accepted the obligations and responsibilities the instrument imposed on them as trustees by signing the instrument, causing it to be recorded and entering upon the duties of trustees. These were sufficient evidences of acceptance, *Bogert, op. cit. supra,* at pp. 57-59, and acceptance of the delivery of the deed was all that was necessary on the part of the trustees and the beneficiary.

Turning to the merits of the controversy, there can be little doubt that Judge Boylan was right in holding that the bank accounts, less the amounts which had been spent for Mrs. Owings' benefit, must be restored to her. The record establishes that the son's name had been put on the mother's bankbooks, not to create a trust for his benefit but to enable him, as agent, to withdraw money for her use, as a matter of convenience if the occasion demanded. The presumption that the use of the trust form of a bank account was intended to convey a beneficial interest yields to proof that the use of the form was not so intended, and was to create an agency to meet the needs and convenience of the owner of the account. *Kuhl v. Reese, Administrator,* 220 Md. 459, and cases cited. Since the son had no beneficial interest in the accounts he had no right to transfer them from his mother's name without authorization from her. The testimony shows she never authorized the transfers. The balances in the savings account and the checking account must be given back to Mrs. Owings.

Whether the deed of trust is to be upheld or set aside is a question of greater difficulty. No presumption of confidential relationship arises in case of a transfer of property without consideration, from a parent to a child. "The relationship must be proved as a fact, and factors which are pertinent in decid-

ing whether it existed include the parent's advanced age, physical debility, and mental feebleness, no one being necessarily conclusive but each having weight." *Masius v. Wilson,* 213 Md. 259, 264, and cases cited; *Wenger, Adm. v. Rosinsky,* 232 Md. 43, 48. Mrs. Owings was of advanced age, she was sick, weak and depressed at her physical weakness, and she was being cared for in part by her daughter in the home of her son in whom she reposed the greatest confidence (restated by her at the trial) and upon whose advice and aid in business and personal affairs she relied. Many of the factors that led the court to find confidential relations in a transfer from parent to child in *Brandenburg v. Harshman,* 193 Md. 104, 111, were present here. We think that a confidential relationship was present and that the burden was on the son and daughter to show the confidence she reposed in them was not abused, that the transfer was fair and just and reasonable under the circumstances, and that the execution of the deed was her free, voluntary and independent act. *Wenger, Adm. v. Rosinsky, supra,* p. 49 of 232 Md.; *Rice v. Himmelrich,* 222 Md. 234, 239; *Masius v. Wilson, supra,* p. 265 of 213 Md.

The chancellor said he felt Mrs. Owings did not fully understand the import of her acts because of the following: her age and health; she did not dictate the terms of the deed; she did not remember her age or the ages or names of her grandchildren; and the gift of the house to her daughter was in conflict with her often expressed intent to leave or give the house to anyone who would take care of her.

There is no showing, or real indication, in the record that Mrs. Owings was not entirely competent mentally when she executed the deed. She appears to be a woman of strong will and independent thought, although she wants her son to help her when she desires it. She admits that the deed was read to her and in part explained. Her absent-mindedness as to ages—if it was that as to her own age—and as to the names of her grandchildren would not necessarily evidence incompetency. *Sellers v. Qualls,* 206 Md. 58; *Masius v. Wilson, supra.* Indeed, upon reflection she recalled the names and approximate ages of the grandchildren. The daughter testified that their home had been broken and that the father had left more to her brother than

to her and, for this reason, it long had been agreed in the family that she would receive the house at her mother's death. Mrs. Owings did not contradict or modify this assertion and spoke of her will, still unrevoked at the time of trial, without indicating the disposition of the house under the will was different from that under the deed. The threats of Mrs. Owings to give the property to anyone who would take care of her were, it may be inferred, probably intended to insure that her children's intention to do and interest in doing that continued. Mrs. Owings may have signed the deed to please her children but we think they met their burden of showing that she knew what she was doing and that, in view of the circumstances, she wanted to do it.

Mrs. Owings testified that her dissatisfaction with the deed began when she was, in her words, "forced" into the nursing home. She said on the stand, speaking of her children, "they took me, forced me up to a nursing home and * * * kept me there for four months and that's the only objection I have to the paper." She continued: "I don't oppose the children to be Trustees, but I don't want to be taken just anywhere, put in a home." Finally, she put it another way, saying: "I don't want to be ruled by that paper."

It can be argued with some force that by executing the deed Mrs. Owings ceased to be her own master in and as to her house. She can not sell it or dispose of it or its avails as she chooses, inter vivos or by will. On the other hand, under the deed all beneficial interest in the home is continued in her while she lives and she is relieved of the management as she desired. As long as she continues in good mental and physical health she can compel the trustees to provide for her, according to the terms of the deed, substantially as if she were the outright owner. If she thinks it a wise precaution she can ask the Circuit Court to assume jurisdiction of the trust and to supervise its enforcement (see Md. Rule V71). At her death it will pass under the deed as it had long been known in the family it would pass, a passing of which she approved and which she has yet to repudiate. If she had become mentally or physically incapacitated while still owning the house outright, she would have had to depend on the judgment, services and aid of her

children or someone else and could take care of herself no better than she can under the deed. Her age, the experience of a stroke and the doctor's prognosis make it likely that disability may recur, perhaps in the not too distant future. We think the arrangement she made was fair and reasonable under all the circumstances. Although the transfer in this case was on an express trust for maintenance and support, it is analogous, in essence and effect, to the situations where as a result of a confidential relationship property was transferred in return for a promise to care for the grantor for life which were held fair and reasonable in *Long v. Huseman*, 186 Md. 495, *Brandenburg v. Harshman, supra,* and *Mackey v. Davidson,* 222 Md. 197, and in which the promise was enforced by the imposition of a constructive trust.

> *So much of the decree appealed from as adjudged the bank accounts in the Union National Bank of Westminster, opened on January 9, 1961, by the appellants to be the individual property of the appellee, is affirmed; and so much of said decree as set aside and declared null and void the deed of the appellee to the appellants as trustees dated January 7, 1961, a n d recorded among the Land Records of Carroll County in Liber No. 330, Folio 336, is reversed, and the said deed is decreed to be valid and effective, according to its terms. The costs shall be paid by the appellants.*