VOGT *v.* VOGT et al.

[No. 25, September Term, 1965.]

 

*Decided January 4, 1966.*

The cause was argued before PRESCOTT, C. J., and HAM-
MOND, MARBURY, BARNES and McWILLIAMS, JJ.

*C. Rogers Hall, Jr.,* and *Joseph A. Matera* for the appellant.

*Roland R. Bounds* for the appellees.

McWILLIAMS, J., delivered the opinion of the Court.

On 24 May 1962, the appellant, Frank L. Vogt, Sr., con-
veyed to his son, Frank L. Vogt, Jr. and his daughter-in-law,
Helen, the appellees,[1] a tract of land near Finksburg in Car-
roll County containing slightly in excess of 30 acres. On 2
August 1963 he sued for the return of it, claiming abuse of a
fiduciary relationship, misrepresentation and fraud. This ap-
peal is from a decree dismissing his bill of complaint. In the
narration of this extraordinary episode we shall call the father
"Frank" and the son "Jake."[2]

Not long after the turn of the century Frank married Char-
lotte Wiebking, a widow with an infant daughter named Dora
Isabella. On 16 December 1913 John F. W. Vogt, Frank's

---

**1.** Although Carroll County Bank and Trust Company was made
a party defendant and filed an answer in the court below, there
has been no appearance for it in this Court.

**2.** His family called him "Jake," apparently to distinguish him
from his father.

father, conveyed to the young couple, as tenants by the entireties, a tract containing 155 acres which, for the next 20 years, was their home and the birthplace of their six children.[3] In 1934 Frank left his family and moved to Rock Hall where he still resides. He and Charlotte were never divorced.

On 15 November 1941 Charlotte executed a deed, in which Frank did *not* join, to Francis Neal Parke [4] conveying all of her right, title, interest and estate [5] in and to what was left of the 155 acre tract.[6] Two days later Judge Parke reconveyed the "undivided one half interest" to Charlotte for life with remainder to the six Vogt children, Lena Vogt (Bowers), a half sister of Frank, and Louis Vincent Carbone, Jr., the son of Dora Isabella Wiebking Carbone, all of whom (herein called the "remaindermen") survived her.

In 1946 a 3 acre parcel was acquired by Jake. It is significant, as will later appear, that his title is evidenced by *two* deeds, one from Frank and one executed by Charlotte and the "remaindermen."

In 1954 a parcel containing slightly less than an acre was conveyed to Edward Stumpfel and wife by Charlotte, Frank and the "remaindermen."

Charlotte died on 5 April 1956. Nine months later Frank and the "remaindermen" (and spouses) conveyed something over an acre to Ralph G. Hoffman, a member of the Carroll County Bar, who, shortly thereafter, transferred it to John F. Vogt, Jake's brother.

After Charlotte's death there was a meeting of the family at Jake's house. It seems they were all present, including Lena Bowers and Louis Carbone. According to John Vogt and his sister, Anne Phillips, all of them knew that the deed from

3. Anne Phillips, John A. F. Vogt, Frank L. Vogt, Jr. (Jake), Margaret A. Hesson, Isabel C. Keller and Minnie Vogt.

4. Judge Parke was a member of this Court from 6 May 1924 to 6 Jan. 1941.

5. The words, " * * * whether in possession, enjoyment, expectancy or by way of survivorship, remainder or reversion * * * " also appear in this deed.

6. About 130 acres had been sold off by Frank and Charlotte prior to 15 Nov. 1941.

Charlotte to Judge Parke was "void" and that upon Charlotte's death the entire title vested in Frank. Louis Carbone, Margaret Hesson and Lena Bowers testified they did *not* know this. Isabel Keller said she had been told but that she did not believe it. Jake had heard about this but he said he wasn't sure it was true. Minnie Vogt did not participate in the trial. Anne and John testified that they all agreed to keep this information from Frank and carry on as though Frank owned 8/16 of the property and each of the "remaindermen" owned a 1/16 interest therein. Louis Carbone remembered the agreement to maintain the status quo but Mrs. Hesson, Mrs. Keller and Mrs. Bowers testified they knew of no such agreement. Jake was satisfied to drift along and he continued to pay rent to John, who was appointed manager, for the part of the property he used in the conduct of his used car and auto parts business. John and Anne made no secret of the fact that they were afraid, if Frank ever discovered that he was the sole owner of the property, he would mortgage it, dissipate the avails and, perhaps, become a burden to all of them.

We can understand why some of them seemed to cling to the notion that they actually owned a 1/16 interest in the property. They were certainly mindful of the fact that, each time a piece was sold, after the deed from Charlotte to Judge Parke in 1943, counsel for the grantees required all of them, and their spouses, including Anne and John, to sign the deeds. For a long time even Jake considered himself a 1/16 owner.

Early in May 1962 Frank, having need of some money, journeyed from Rock Hill to Finksburg and offered to sell Jake 3 shares [7] of the property for which he wanted $3000. Jake told Frank he was not interested in buying 3 shares but that he was willing to buy his entire interest in the property, namely, 8 shares for $8000. Jake thought at the time that his father's interest, in addition to his own 1/16, would "make [him] * * * own over half of the property, which would give [him] * * * some authority of using it for [his] * * * business * * *." After Frank agreed Jake instructed D. Eugene Walsh, a mem-

---

7. Frank considered he owned 8/16 of the property. In his reckoning a share was 1/16.

ber of the bar of Carroll County, to prepare the necessary papers. Mr. Walsh, an eminent and highly regarded practitioner, scheduled the settlement for 24 May and instructed his clerk to prepare a deed conveying Frank's half interest to Jake and his wife. Before they arrived at his office Mr. Walsh reviewed the report of the title company and saw that Frank owned, not a half interest, but the entire interest. After they arrived he said to Frank: "I said Frank you have more than a half interest in this property in my opinion. I said this deed that Judge Parke prepared * * * I do not believe created a half interest in your wife. I think that what you have is a full, hundred per cent interest in the property."

After some discussion Frank agreed to convey the entire title to Jake. Jake agreed to pay him $8000 and, in addition, pay $1000 to each of the "remaindermen." Jake said he wanted "to make sure the children all each got their share." Mr. Walsh said Frank agreed to this. He added, "And I spent considerable time with him and I felt that he understood what I was talking about."

The deed and mortgage were rewritten and executed by Frank and Jake. Helen, Jake's wife, was sent for and her signature was affixed to the mortgage. A month or two later Frank was summoned by John to a meeting of some of the children and as he put it "they flew into me and they just raked me over the coals. I said, what's the matter? They said you went and sold Jake that whole farm." This confrontation upset the old man to such an extent that he went to Jake the next day and upbraided him, saying, "* * * [Y]ou played hell. * * * I said, now, listen, Jake, you're going to get this thing straightened out satisfactory. * * * and if I don't get a satisfactory answer, I said, I'm going to take and haul your fanny into court." And so he did but it took him about a year to get around to it.

Meanwhile Jake built a garage on the property, paid interest (which Frank accepted) on the $5000 purchase money mortgage, satisfied the $3000 note given to Frank at the time of settlement and deposited with Senator Weant [8] enough to give

---

8. Edward O. Weant, Jr., of counsel for appellees in the trial below, was at that time a member of the Senate of Maryland. On

each "remainderman" $1000.[9] In May 1963 Jake tendered payment in full of the $5000 purchase money mortgage.

Appellant relies heavily on a letter written by Helen Vogt (Jake's wife) to Anne Phillips a few months after the settlement. After commenting on a recent trip to Florida, the serious illness of her mother, the activities of her children, jury duty and painting the house she wrote: "You may have heard by now that Jake has bought *your father's half of the farm.*" (Emphasis supplied.) Pressed for an explanation she said she was unaware that Jake had acquired the entire title until sometime in September when the deed arrived in the mail and she read it for the first time. Asked if she signed mortgages without reading them she said, "Yes, I sign whatever my husband tells me." We think this indicates merely that Jake did not tell her everything or else she did not fully understand or did not pay attention to what he did tell her. It neither vitiates nor attenuates the testimony of Jake and Mr. Walsh.

The truly odd thing about the posture of the appellant is that he is seeking the return of a *one half* interest only, and for the sole purpose of conveying the same to son John. The consideration is to be the same ($8000), and is to be paid, not to Frank, but $1000 to each of the "remaindermen." In short, Frank's situation will not have changed in any respect, the "remaindermen" will be receiving precisely the same amount, Jake will get back $8000 and instead of having a 100% interest in the property he will be a co-tenant along with John.

Frank contends that a confidential relationship existed between him and Jake; Jake denies any such relationship. There seems to be no dispute between the parties as to what principles of law the Chancellor should have applied in determining this issue. Indeed, they cite virtually the same authorities in support of their respective contentions. In *Hoffman v. Rickell,* 191 Md. 591, 598, 62 A. 2d 597 (1948), Chief Judge Marbury, for the Court, cited *Mead v. Gilbert,* 170 Md. 592, 185 Atl. 668 (1936), wherein it is stated:

24 Feb. 1965 he became an Associate Judge of the Circuit Court for Carroll County, succeeding the late James E. Boylan, Jr.

9. At the time of trial Lena Bowers, Isabel Keller, and Margaret Hesson had accepted the money and had given quit claim deeds to Mr. Weant.

"* * * [W]here a conveyance from a parent to a child is attacked, the existence of a confidential relationship between the parties is a fact to be shown, as in any other case where it is not presumed as a matter of law (*Upman v. Thomey, supra* [145 Md. 347, 125 Atl. 860 (1924)]), and that in such an inquiry advanced age, physical debility, and mental feebleness are all facts, no one of which is necessarily conclusive, but any one of which may have weight in determining whether the relationship as a fact existed."

We have quoted the language set forth above, with approval, in a number of cases. The applicable law relative to confidential relationships is well settled and there is no need for us to expatiate further in this direction. *Owings v. Owings,* 233 Md. 357, 196 A. 2d 908 (1964); *Piraino v. Betka,* 218 Md. 548, 147 A. 2d 712 (1959); *Masius v. Wilson,* 213 Md. 259, 131 A. 2d 484 (1957); *Henkel v. Alexander,* 198 Md. 311, 83 A. 2d 866 (1951); *Gaver v. Gaver,* 176 Md. 171, 4 A. 2d 132 (1939); *Tracey v. Tracey,* 160 Md. 306, 153 Atl. 80 (1931).

Judge Sachse, who heard the case below, made a careful, comprehensive and detailed analysis of the evidence. He declared it insufficient to support a confidential relationship between Frank and Jake and he said he could find nothing to indicate that the transaction was unfair, improper or unreasonable.[10] We agree.

Frank was indeed 74 years old and we can believe he "didn't quite get through the second grade" but there is little doubt that he emerges from this record as a healthy, alert, aggressive and rather feisty oldster, who solicited Jake to buy an interest in the property, not because Jake was his "favorite child," but, because Jake had the money and was just about the only customer in sight who could possibly be interested in a fractional interest. Frank complains to us that he had no independent advice but, it will be recalled, several weeks passed before the settlement took place, during which he was free to consult an at-

10. Judge Sachse also set aside the deed from Charlotte to Judge Parke.

torney of his choice or any of his children. We think it can readily be inferred that he was anxious to conceal the transaction from his other children, anticipating, perhaps, the reproaches with which he was subsequently belabored. In any event, it is unlikely he could have obtained any better or more impartial advice than that provided by Mr. Walsh. The evidence is not nearly sufficient for the creation of the confidential relationship which would put upon Jake the burden of showing that the transaction was fair, proper and reasonable. *Masius v. Wilson*, 213 Md. 259, 265, 131 A. 2d 484 (1957).

Assuming, however, that Jake must meet this burden, we think there is an abundance of evidence to support Judge Sachse's finding that the transaction was fair, proper and reasonable. Perhaps it would not be unfair to say that John is the real plaintiff in this case and that Frank is simply playing Trilby to John's Svengali.

The decree passed by Judge Sachse will be affirmed and the costs will be paid by the appellant.

*Decree affirmed. Costs to be paid by appellant.*