LUSBY, ET AL. *v.* NETHKEN, ET AL.

[No. 111, September Term, 1969.]

*Decided January 12, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SMITH and DIGGES, JJ.

*Leonard H. Wonneman* and *Hyman Ginsberg,* with whom were *Ginsberg & Ginsberg* on the brief, for appellants.

*Wilbur D. Preston, Jr.,* with whom were *Luther B.*

*Ditch, Ascanio S. Boccuti* and *Due, Whiteford, Taylor & Preston* and *Lewis R. Jones* on the brief, for appellees.

McWilliams, J., delivered the opinion of the Court.

The genesis of this seemingly senseless quarrel is obscure. Its flowering was the filing by the appellants (George and Louise) of a bill of complaint in which Robert was accused of inducing their mother (Caroline) "to arrange her affairs so as to inure to the benefit of * * * Robert * * * and to the disadvantage of * * * [appellants]." Caroline, they alleged, was "so infirm, debilitated and senile" for the three years before her death in October 1966 "as to be incapable of executing a valid deed, will,[1] contract, gift, or to otherwise exercise the legal responsibilities and rights of a normal person." Robert was charged with accomplishing his "nefarious" purpose by "flattery and blandishments," deliberate and fraudulent coercion and undue influence. Fifteen items of Robert's alleged skulduggery are cited. By way of relief appellants asked, among other things, that Robert "be compelled to pay [them] a sum of not less than $166,-355.55 * * * as *reparations* in these proceedings." (Emphasis added.) Nowhere is it alleged or proven what, if any, interest they might have in Caroline's estate. The trial below ended in the granting by the chancellor, Hamill, J., at the conclusion of appellants' case, of Robert's motion to dismiss. Maryland Rule 535. Before proceeding to a consideration of appellants' contention that a confidential relationship existed between Robert and Caroline, a brief comment about the contemporary history of the Nethken family will be helpful.

The parties are the middle-aged children of W. Reese

---

1. We thought it odd, in the circumstances, to see in the record a stipulation prepared for use in the Orphans' Court in which the parties agreed that Caroline's will (not in this record), dated 22 August 1966, was *not* procured by fraud *nor* by undue influence exercised and practiced upon her by Robert and that on that day "she was of sound and disposing mind and capable of executing a valid deed or contract."

Nethken and Caroline Pritts Nethken. George is the eldest; Louise, the youngest, is the wife of Dr. Thomas F. Lusby, a Cumberland physician. Robert, the appellee, was the second child. For many years Reese Nethken was in the coal brokerage business in Cumberland. He was the president and sole owner of W. R. Nethken & Co., Inc., until 1938 when Robert, after supplying the company with badly needed money, acquired 50% of the stock. Caroline's role in the business was that of bookkeeper. When Reese Nethken became an invalid in 1947 Robert assumed the management of the company and in June 1948 he acquired the remaining 50% of the stock. His ownership of this stock is not under attack. After the death of his father in 1960 the company paid Caroline $12,000 annually until 1964 when she retired. From then until 1966 she was paid a pension of $450 per month. From early 1966 until her death she was paid $300 per month.

Since all of the transfers about which the appellants complain are alleged to have taken place subsequent to 1960 it is necessary to examine in some detail the relationship between Caroline and her children after the death of her husband in 1960 until her own demise in October 1966. Upon becoming a widow she moved to a house Robert had built for her on land he owned in Oakland. She lived there alone and continued her job as the company's bookkeeper. She went regularly to the bank, the beauty parlor and the food stores. She paid her own bills, wrote her own checks and balanced her own checking account. She was a regular reader of the financial pages of the Baltimore Sun and she followed the movement of the stock market with keen and intelligent interest. George and his wife and Louise and her husband had unrestricted access to her at all times. They visited her regularly and frequently. From time to time she made gifts to them using checks which she wrote herself. She was a patient of her son-in-law, Dr. Lusby. There was nothing to prevent her seeking and getting advice from any of her children or their spouses. In 1964 she moved

to Bethesda where she had rented an apartment of her own selection. She underwent, during this period, a successful operation for the removal of her cataracts. In June 1965 she selected and rented an apartment in Cumberland where she lived alone until January 1966, when she fell and sustained the injury which necessitated her removal to a nursing home in Towson, where she died, at the age of 81, on 2 October 1966. While at the nursing home George and Louise were quite free to visit her and the record shows that they and their spouses did so. Although Robert found it necessary to be more active in helping her manage her affairs after she entered the nursing home, we note that none of the transfers about which appellants complain took place during this period.

We have examined the record with considerable care but we have not found any evidence that Caroline, at any time, was mentally incompetent. The testimony of Dr. John Scott was solicited by Dr. Lusby. He stated in his letter of 18 July 1968 to Dr. Scott that he was "particularly hopeful that * * * [appellants] can establish by * * * [his] testimony, based on * * * [his] medical records, that Mrs. Nethken was senile on or before October 18, 1963, and as such could easily be persuaded or imposed upon by a close relative." Dr. Scott's testimony falls far short of establishing mental incompetence. In 1963 he reported to Dr. Lusby that "she seems to have slowed down some mentally and I do not believe her memory is quite as good as it was. In general, though [he continued], she seems to be fairly normal for her seventy-eight years." Each of us hopes, assuming the attainment of age 78, that his condition will justify as favorable a report. Dr. Scott did not see her again until 2 February 1966, the day after she entered the nursing home. On that day he noted that she was an "essentially healthy, 80 year old" woman whose mind was "clear" and whose memory was "fairly good." His diagnosis was "mild senility," "arteriosclerotic heart disease, compensated" and "osteoarthritis, not severe." He attended her from time to time thereafter and on 27 September 1966,

five days before she died, he wrote on her chart, "Patient had periods of confusion and brief semi-coma, as if she were having small cerebro-vascular episodes. Today she seems very 'good.' Memory is not bad. She is oriented."

As we see it, whether George and Louise have established the existence of a confidential relationship between Caroline and Robert is really the only question before us. The decisions [2] of this Court from which the applicable law has been distilled have been reviewed and discussed so often that, as we said in *Vogt v. Vogt*, 241 Md. 82, 88 (1966), "there is no need for us to expatiate further in this direction." There can be little doubt, from this record, that Caroline in 1960 (at age 75) was a healthy, alert, independent, capable woman with great strength of character. In 1963 Dr. Scott said "she seems to be fairly normal for her 78 years." In February 1966 he noted that she was "an essentially healthy 80 year old woman" with a "clear" mind and a "fairly good" memory. That she was a woman of considerable intelligence is abundantly clear. The record will not sustain a suggestion that she relied entirely upon Robert for business advice. Indeed, it is quite clear that, for the most part, she made her decisions on information acquired from other sources. For instance, in 1965 after reading that "A. T. & T. was going to split" she had Robert take money out of a checking account, where it was "not drawing any money," and buy 100 shares of the stock because she "thought it was a good investment." It is true, of course, that, as a practical matter, she was supported by Robert but it is also true that he accomplished this in a way that enabled her to be and to feel completely independent. He did not just pay her bills nor just dole out money to her as she needed it. He paid her a salary until 1964

2. *See Cassell v. Pfaifer*, 243 Md. 447 (1966); *Owings v. Owings*, 233 Md. 357 (1964); *Akin v. Evans*, 221 Md. 125 (1959); *Masius v. Wilson*, 213 Md. 259 (1957); *Tribull v. Tribull*, 208 Md. 490 (1956); *Brandenburg v. Harshman*, 193 Md. 104 (1949); *Gaver v. Gaver*, 176 Md. 171 (1939); *Tracey v. Tracey*, 160 Md. 306 (1931) and the cases cited therein.

and after that a pension. She spent this money as she pleased. Using a part of it she accumulated over $50,000 worth of securities. In the final 10 years of her life she made 50 some separate cash gifts to Louise, totaling more than $5,000. We have not discovered here any of the incidents or circumstances which, in other cases, we have said provide a sufficient basis for the finding of the existence of a confidential relationship. Appellants dwell upon some of the circumstances of Caroline's gradual deterioration after she entered the nursing home; e.g., replacing soiled clothing in her dresser drawers, a lack of cleanliness, indifference to the exposure of her body, rudeness to friends, etc., but all this seems to be without significance and, as we have said, none of the transfers complained about took place during this period.

Although we are fully persuaded, as was the chancellor, that the "evidence falls far short of showing that Robert was in a confidential relationship with * * * [Caroline] at the time of any transfers from her," nevertheless we find it comforting to observe that we have found nothing to indicate that any of the alleged transactions was unfair, improper or unreasonable. The chancellor also expressed the opinion that the evidence "certainly does not establish that Robert Nethken ever profited financially because of coercion, influence or any special relationship, confidential or otherwise." We have not seen in the record anything which could support any other or contrary opinion. Nor do we find it either necessary or desirable to prolong this opinion by a discussion of the details of the 15 items listed in appellants' bill of complaint.

The chancellor, who found it "most distressing * * * to see these intelligent, refined and highly respected brothers and sisters at odds," took note of the fact that the appellants called Robert as a witness and that they were "bound by his uncontradicted testimony" and that by so doing "they have actually helped prove the case against them that there was no fraud, no undue influ-

ence and no confidential relationship." In their brief appellants argue that the evidence which, together with all legitimate inferences, we must view most favorably to them makes out a prima facie case shifting to Robert the burden of going forward with the evidence. Even were we to agree that appellants have established, prima facie, the existence of a confidential relationship they relieved Robert of the burden of going forward with the evidence by calling him as their witness and becoming bound by his uncontradicted testimony demonstrating conclusively that the transactions with his mother were done either at her request or subsequently ratified and approved by her and that they were in every respect fair, reasonable and proper. *Williams v. Wheeler,* 252 Md. 75 (1969), and *Vokroy v. Johnson,* 233 Md. 269 (1964).

Robert, in his brief and in argument before us, raises the question whether appellants have shown an interest in Caroline's estate sufficient for the maintenance of their suit. The chancellor seems not to have considered it and it is our impression that it is raised in this Court for the first time. In any event, the holding announced in this opinion obviates the necessity for our consideration of the question.

*Order affirmed.*
*Costs to be paid by appellants.*