## SANDERS *v.* SANDERS

[No. 338, September Term, 1970.]

*Decided March 8, 1971.*

*Motion for rehearing filed April 7, 1971; denied April 8, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

*William W. Grant* for appellant.

*Stephen R. Pagenhardt* for appellee.

SINGLEY, J., delivered the opinion of the Court.

The appellant, Francis W. Sanders (Francis) and the appellee, Neil Gordon Sanders (Neil) are the sons of William Franklin Sanders (Mr. Sanders) who died in Garrett County, Maryland in December, 1968, in his eighty-first year. Mr. Sanders had four other children, another son and three daughters, who are not parties in this case. This action was brought by Francis against Neil, to impose a constructive trust on the assets received by Neil from Mr. Sanders at and prior to the latter's death. From an order of the Circuit Court for Garrett County dismissing the bill of complaint, Francis has appealed.

Most of the facts underlying the controversy are not in dispute. Mr. Sanders, a Garrett County farmer, sold his farm in 1962, but continued to live in a house on the farm until after the death of his wife in 1963. A month after his wife's death, Mr. Sanders executed a will, dividing his estate equally among his six children, and naming Neil his executor. In December, 1963, Mr. Sanders moved from the farm to Neil's house in Oakland, where he stayed until his death, except for a period of about five weeks, commencing in mid-September, 1968, when he lived with Francis.

Although Mr. Sanders had suffered two strokes before he moved to Neil's house, he was by no means an invalid. He could still drive his car, and did so for about two years, and could go to his bank, The Garrett National, where Neil was employed. He could not bathe himself, however, and had some difficulty in climbing stairs. At the time of the move, Mr. Sanders' assets (with which none of the children except Neil was familiar) consisted of a savings account with a balance of $12,012.82 (later increased to $23,341.30 when the balance of proceeds from the sale of the farm was received); a $2,266.17 paid-up life insurance policy; and $3,100 face amount of savings

bonds. Mr. Sanders' wife had been named as joint owner of the savings account and of the bonds and as beneficiary of the life insurance policy. Mr. Sanders' income at this time consisted of interest earned on his savings account and social security payments.

On the day that Mr. Sanders moved into Neil's house, he executed a power of attorney in Neil's favor and opened a checking account, over which Neil had a power of withdrawal. Into this account went some of the interest from the savings account and some social security checks. From this account Mr. Sanders paid small bills, and the board which he paid Neil, which reached $80 a month in the last two years of Mr. Sanders' life.

In November of 1964, after Mr. Sanders had been at Neil's house for nearly a year, Neil was substituted for his mother, who had died in 1963, as joint owner of the savings account and of the bonds, and as beneficiary of the life insurance policy. This was accomplished at The Garrett National Bank, with the help of a bank officer. Neil was present, but did not participate.

In September of 1968, Neil's son died, and Mr. Sanders moved to Francis' house. Francis and his wife were employed, and Mr. Sanders was cared for by his daughter Audrey, who was visiting Francis. When Audrey decided to return to Florida, Francis proposed that Mr. Sanders be placed in a nursing home.[1] Mr. Sanders became very upset and moved back to Neil's house on 22 October 1968.

What happened next sowed the seeds of the controversy. On 18 November, Neil drew $3,000 from the joint savings account to pay for an electric heating plant which had been installed in his house. On 30 November, a vice president of the bank came to Neil's house, where Mr. Sanders withdrew the balance of some $21,000 in the account, which was then transferred to an account in Neil's name alone.

A few days after Mr. Sanders' death, Neil filed the

---

1. Francis had made some inquiries, and suggested that if Mr. Sanders' assets could be reduced to $2,500, he would be eligible for public assistance.

will with the Orphans' Court for Garrett County, but stated that there were no assets. A day later the will was admitted to probate. A month later, as surviving joint tenant, Neil paid the inheritance tax on one-half of the balance in the savings account and on one-half of the value of the jointly owned savings bonds.

Almost immediately, Francis instituted the proceeding to impose a constructive trust on the assets in Neil's hands. When the case came on for trial, five witnesses testified in support of the complaint: Francis; June Sanders, Francis' wife; Helen Fike, one of Mr. Sanders' daughers; Pauline Eggers, Mr. Sanders' sister; and Neil, who was called as an adverse witness. There was no suggestion that Mr. Sanders was incompetent. There was testimony that he drove his own car, paid his own bills, served on the election board until 1966, and was confined to his bed only during the last week of his life. It seemed to be conceded that he was well cared for at Neil's house, where he had his own room and bath on the first floor. No one so much as intimated that Mr. Sanders was the victim of any fraud or that he had been subjected to influence or duress.

At the conclusion of Francis' case, Neil moved to dismiss, contending that no confidential relationship had been established. The chancellor denied the motion, and we think quite properly, on the ground that the designation of Neil as Mr. Sanders' attorney in fact under the power of attorney established just such a relationship. The effect of this was to shift to Neil the burden—which is a heavy one under the cases later to be cited—of proving that there had been no abuse of the relationship.

Neil took the stand and testified that Mr. Sanders had the power of attorney drawn and Neil's name placed on the savings account, on the savings bonds, and on the life insurance policy at The Garrett National Bank, where Neil worked. When questioned about it, Neil said:

"Q. Now, when this power of attorney was executed, was it a result of your idea?

"A. No, sir.

"Q. What about the change of the checking account into joint names, was that your idea?

"A. No, sir, he done it all himself.

"Q. Did you ask him to?

"A. No, sir.

"Q. Did you induce him to do it?

"A. I did not.

"Q. Or urge him to do it?

"A. No, sir.

"Q. It was his own idea?

"A. That's right."

\* \* \*

"Q. Now, about the same time, you already testified to this, that the life insurance policy was changed and you were made beneficiary, is that correct?

"A. That's correct.

"Q. Who took care of this for him?

"A. Mr. Stover.

"Q. Did you ask your Dad to have the beneficiary changed?

"A. No, sir, he had it done himself.

"Q. And you did not urge him to?

"A. No, sir.

"Q. It was his idea?

"A. That's right."

\* \* \*

"Q. Now, on these bonds that you already testified to that there were seven — six $500.00 ones and one $100.00 one, is that correct?

"A. That's right.

"Q. And in November, 1964, they were also changed naming you as one of the joint owners, is that correct?

"A. That's right.

"Q. Where was this done?

"A. Down at the bank.

"Q. And were you present at the time?

"A. That's right.

"Q. Did you urge your father to change these bonds and put them in joint names?

"A. No, sir.

"Q. Did you ask him to do it?

"A. I did not."

As regards the closing of the savings account, Neil said that it was at his father's insistence that he called Nordeck Shaffer, a vice president of The Garrett National Bank, who went to Neil's house to see Mr. Sanders. Mr. Shaffer described the visit:

"Q. You did go to the home, is that correct?

"A. Yes, sir.

"Q. And for what purpose?

"A. Mr. Sanders wanted to change his savings account.

"Q. Change it how?

"A. It was a joint account, he wanted it changed and put into Neil's name.

"Q. It was a joint account between William F. Sanders and Neil Sanders, is that correct, or it had been?

"A. Yes, sir.

"Q. And what did you tell Mr. William Sanders when you got to the home of Neil?

"A. I explained to him that it was a joint account payable to either he or Neil, those two people were the only ones that would be able to withdraw funds from it.

"Q. All right, and you explained this to him?

"A. I did.

"Q. And what did he say?

"A. That he wanted to put it in Neil's name."

* * *

"Q. Mr. Shaffer, you testified that you explained that the savings account was already joint and there was no reason to change it, is that correct?

"A. I—I didn't explain that there was no reason to change it, I explained to him that it was a joint account payable to either one of parties named on the account, with nothing—the withdrawal of those two and no one else.

"Q. After explaining that, you still changed the account, is that correct?

"A. That's true.

"Q. How did you change it?

"A. Mr Sanders signed a check for the balance in the joint account.

"Q. Who signed this check for the balance in the account?

"A. Mr. Sanders.

"Q. That's —

BY THE COURT: Is this Mr. William Sanders?

"A. Yes, Mr. William F. Sanders.

"Q. Was — who else was present when this transaction occurred over at Neil's home?

"A. I believe Neil and his wife and his sister, Freda.

"Q. Now what, if anything, did Neil say at the time you were at the home, concerning the change of the account?

"A. I believe he indicated to his father that it was a joint account payable to either one of the two of them.

"Q. Did he want him to make the change which was made that day?

"A. I don't believe he did."

Freda Fulk, Neil's sister, called as a witness for Neil, described what happened in respect of the closing of the savings account:

"Q. Now, you were also visiting Neil and your father when Mr. Shaffer came to the home, is that correct?

"A. Yes, I was.

"Q. And do you know whether or not it was Neil's idea to call Mr. Shaffer at the bank?

"A. No, it was not, it was my idea.

"Q. And why was it your idea?

"A. Can I use my Daddy's name?

"Q. Yes, not what he said, but—you asked Neil to call Nordeck Shaffer, is that correct?

"A. Yes, I did.

"Q. And why did you ask him?

"A. To ease my Daddy's mind.

"Q. What were you afraid of if you didn't call that particular morning?

"A. I wasn't afraid. I only wanted my Daddy to have peace of mind."

\* \* \*

"Q. All right, then I'll ask you this, did Neil try to discourage him or did he urge — or did he want to call Mr. Nordeck Shaffer?

"A. Neil and Mr. Shaffer both tried to discourage him.

BY THE COURT: They did what?

"A. Both tried to discourage him.

BY THE COURT: All right.

"Q. In your opinion, was your father the type of person that could be easily swayed to do things against his will up to the time of his death?

"A. Never."

At the conclusion of the testimony, Neil renewed his motion to dismiss. While the court's reasoning in its oral opinion might have been more precisely articulated, what the court was saying was that Neil had rebutted the presumption which arises once a confidential relationship has been established:

"\* \* \* the only other means of setting aside a gift inter vivos as we have here is by showing a

confidential relationship where fraud, duress or undue influence was used upon the parent by a child, as in this case, to induce him to make this gift to the exclusion of other children or other people."

\* \* \*

"\* \* \* Now, it seems to me, [Mr. Sanders] never having been incompetent, that that was approximately four years before he died, and it seems to me that he certainly, over the period of years, has ratified that gift by not revoking it, rescinding it or complaining about it. Apparently this is what he intended to do and did it, and there has been no sufficient evidence here to show that he was incompetent or that there was any fraud, duress or undue influence exercised upon him by Mr. Neil Sanders."

We have held that once a plaintiff has adduced sufficient evidence to establish a confidential relationship, the burden shifts to the defendant to show the fairness and reasonableness of the transaction, *Wenger v. Rosinsky*, 232 Md. 43, 50, 192 A. 2d 82 (1963) ; *Tribull v. Tribull*, 208 Md. 490, 507, 119 A. 2d 399 (1956). In the absence of the legal presumption which arises from certain relationships (*e.g.*, attorney-client, trustee-cestui but not ordinarily child-parent, compare *Henry v. Leech*, 123 Md. 436, 91 A. 694 (1914) with *Williams v. Robinson*, 183 Md. 117, 36 A. 2d 547 (1944) ), the existence of a confidential relationship is a question of fact, not of law, *Zimmerman v. Hull*, 155 Md. 230, 239-40, 141 A. 531 (1928). In other words, once the relationship is proved, the plaintiff is relieved from the necessity of proving "the actual exercise of overweening influence, misrepresentation, importunity or fraud," *Vocci v. Ambrosetti*, 201 Md. 475, 485, 94 A. 2d 437 (1953) and the defendant has the burden of showing that a fair and reasonable use has been made of the confidence, "that the transfer of the property was the deliberate and voluntary act of the grantor

and that the transaction was fair, proper and reasonable under the circumstances," *Rice v. Himmelrich,* 222 Md. 234, 159 A. 2d 647 (1960) ; *Masius v. Wilson,* 213 Md. 259, 131 A. 2d 484 (1957). See also *Vogt v. Vogt,* 241 Md. 82, 215 A. 2d 741 (1966) ; *Owings v. Owings,* 233 Md. 357, 196 A. 2d 908 (1964) ; *Mosebach v. Jenness,* 224 Md. 395, 168 A. 2d 182 (1961) ; *Blair v. Haas,* 215 Md. 105, 137 A. 2d 145 (1957). And *cf. Wenger v. Rosinsky, supra,* 232 Md. 43.

Whether the defendant meets this burden, which is a heavy one, depends on the facts in each case. Compare *Rice v. Himmelrich, supra,* and *Masius v. Wilson, supra,* involving inter vivos transfers within the family, where the burden was held to have been met, with *Wenger v. Rosinsky, supra,* 232 Md. 43, "The Case of the Shorn Sergeant", where it was held not to have been met by the shearing landlady of a sergeant retired from the Marine Corps because of ill health. See also *Stacy v. Burke,* 259 Md. 390, 269 A. 2d 837 (1970) and *Lusby v. Nethken,* 256 Md. 469, 260 A. 2d 640 (1970).

We think, as did the chancellor, that Neil has met the burden. He was impressed, as are we, by the fact that the really significant event took place in November, 1964, four years before Mr. Sanders' death. It was at that time that Mr. Sanders made Neil the joint owner of the savings account and the bonds and designated him as beneficiary of the life insurance policy. There is not even a suggestion that this was not completely voluntary on Mr. Sanders' part. While Francis makes much of the fact that Mr. Sanders stripped himself of his assets, other than his social security payments, he did so, in a sense, in 1964, although he retained a considerable measure of control, including the right to revoke the arrangement, should he have a change of heart.

Four years passed, during which Mr. Sanders made no change in the provision he had made, which he could have done at any time. During the same period, Neil drew no checks on the checking account, acted under the power of attorney only at his father's direction, and made but one

withdrawal from the savings account: $3,000 to pay for the electric heating system. It was Neil's uncontroverted testimony that this withdrawal was not his idea.

The closing of the savings account was at Mr. Sanders' insistence, and was done over Neil's protest. As a practical matter, since Neil already had the power to make withdrawals from the account, this did no more than to effect an immediate transfer of funds which would have passed in any event to Neil as surviving joint tenant at his father's death.

It is clear to us that the chancellor was not in error when he found that Neil had met the burden of showing that he had fairly and reasonably discharged the confidence imposed upon him.

*Order affirmed, costs to be paid by appellant.*